BOLIN, Justice.
Dixon Mills Volunteer Fire Department, Inc. (“the fire department”), and its assistant fire chief, Louis Cass White (hereinafter referred to collectively as “the petitioners”), petition this Court for a writ of mandamus directing the Marengo Circuit Court to vacate its order denying the petitioners’ motion for a summary judgment on the basis of immunity as to- the negligence claims asserted against them -by L.C. Westbrook, Jr., and Kimberly Lewis (hereinafter referred to collectively-as “the plaintiffs”). We grant the petition in part, deny it in part, and issue the writ.

Facts and Procedural History

The fire department was incorporated on September 21,1993, for the “purpose of forming a non-profit corporation ... exclusively for charitable ... purposes within *328 -the meaning of Section 501(c)(3) of the U.S. Internal Revenue Code of 1954.” The fire department has been serving the citizens of the Dixon Mills community in Marengo County since its incorporation.
On November 9,1993, the Alabama Forestry Commission sought the Marengo County Commission’s “blessing and support” for the fire department through its approval of an agreement the Forestry Commission and the fire department had entered into, pursuant to which the Forestry Commission, recognizing the importance of organized and coordinated fire protection, agreed to provide equipment to the fire department in support of its firefighting efforts. The agreement required the fire department to obtain insurance for the fire equipment and to maintain the fire equipment in a “high state of readiness.” The Marengo County Commission approved the agreement.
Dixon Mills is not an incorporated municipality; it is an unincorporated community, with no organized form of government. Bruce Baker, the fire department’s chief, testified that the original source of funding for the fire department consisted of donations of. equipment from other fire departments. Baker testified that the fire department has since gotten bank loans to acquire equipment. Baker also stated that the fire department approached the Mar-engo County Commission “several years ago” seeking the passage of a “two mill” county tax as a-source of funding. The tax initiative was presented to the public for a vote and passed. Baker stated that the revenue generated by the tax initiative is split among 10 fire departments that are members, of the Marengo County Firefighters Association,[1] The fire department does not compensate its firefighters for their services.
On the morning of November 13, 2012, White received an . emergency 9-1-1 call dispatching the fire department to a house fire. White, along with firefighters Reginald Clark and Willie Maye, gathered at the fire department before 7:30 a.m. and assembled their equipment. White, Clark, and Maye then left the fire station in the department’s fire truck, which White was driving. White activated the lights and siren on the fire truck. At approximately 7:30 a.m., the fire truck, which was traveling south on County Road 6, approached the intersection of County Road 6 and State Highway' 10. At the same time, the plaintiffs were traveling east on Highway 10 in a vehicle being driven by Westbrook in which Lewis was a passenger. The plaintiffs were traveling at approximately 45 m.p.h. Traffic at the intersection was eqntrolled by stop signs on County Road 6. The* fire truck and the plaintiffs’ vehicle collided at the intersection of County Road 6 and Highway 10. The plaintiffs were seriously injured.
White testified in his deposition that as he approached the intersection of Highway 10 and County Road 6 he began slowing down and brought the fire truck to a complete stop at the stop sign on County Road 6. White stated that he -let some traffic on Highway 10 clear and that he then eased the truck forward to get a better line of sight both east and west along Highway 10 and came to a complete stop again. White testified that when he saw no approaching vehicles he proceeded through the intersection and across Highway 10. He testified that, at that moment, firefighters Clark and Maye shouted to him that a vehicle was approaching. Having already *329 committed to proceeding through the intersection, White accelerated through the intersection in an attempt .to clear, the intersection and to avoid Westbrook’s oncoming vehicle. However, White was unsuccessful in doing so, and Westbrook’s vehicle struck the fire truck near the rear tire. .....
Both firefighters Clark and Maye stated that White brought the fire truck to a complete stop at the stop sign before proceeding through the intersection. Clark and Maye both stated that as White proceeded through the intersection. Clark shouted that a vehicle was approaching and that White tried to make it through the intersection but was unable to do so,
Westbrook initially -testified in his deposition that the fire truck did not stop at the intersection and that it was moving across Highway 10 when he first saw it. West-brook stated that “[the fire truck] just came out in the road in front of me ... a split second [and] he was there.” However, upon further questioning, the petitioners’ counsel elicited the following testimony:
“Q. When you first saw the fire truck, was any part of the fire truck crossing Highway 10?
“A. He was just coming out in the road, because we ... was coming in the road, ain’t expecting nothing' to come out.
[[Image here]]
“Q. All right. So are you saying that you were basically almost to the intersection or in the intersection when you saw him for the first time?
“A. I was in.the intersection.
[[Image here]]
“Q. All right. Now, so the first time you saw him, he was already starting to — the truck was already starting to cross Alabama Highway 10 then?
“A. I’m going to say- he come in the road. He just come out in the road right there, and he was on me. I couldn’t do nothing.
“Q. : I understand that. My question is: That at the time you first saw-him, he had already — he was already past the stop bar at County Road 6 where the stpp sign was? He was already in the road?
' “A. Yes, sir. He was coming in the road. He was just coming in the road.
“Q. So you don’t know whether he stopped for that stop sign or not, do you?
“A. No, he didn’t stop. Really, he didn’t.
“Q. But if the placement of the vehicle there in the road where you’re telling me that you first saw the fire truck is accurate, you don’t know — you didn’t see him then before he reached the stop sign, did you?
“A. No, you can’t ¡see him, because he come around'that littje bend there.
[[Image here]]
“Q. All right. I guess what I’m getting at, Mr. Westbrook, is this: If the fire truck was out in the toad the first time you saw' it, how do you know whether or not it actually stopped? How do you know whether or not it stopped at the stop sign here?
“A. Like I say, when I come up the road, we was just driving the road. He just all of a sudden come out in the road in front of me.
“Q. I guess what I’m getting at is: You don’t know whether he stopped at the stop sign'and came out in front of you or.whether he. ever stopped at all? You don’t know do you? - ■
*330 “A. No, sir.”
Lewis testified as follows:
“Q. All right. When you first saw the fire truck, was it in the roadway on Alabama Highway 10, or did you see it further back on County Road 6?
“A. ... [I]t was in the road.
[[Image here]]
“Q. All right. But you do recall it was — part of the truck was in the roadway when you first saw it, Highway 10?
“A. Yes, sir.
[[Image here]]
“Q. So you saw [the fire truck] behind the stop sign?
“A. It was coming out. It wasn’t behind the stop sign. When I seen him, he was coming out in the back of the woods onto Highway 10.
“Q. I understand that. I guess what I’m getting at is: Did you ever see the fire truck completely behind that — you know where the — when I say the stop bar, do you know what I’m referring to?
“A. Yes, sir, the stop sign.
“Q. The stop sign? Did you ever see the truck behind the stop sign?
“A. No.
“Q. So, basically, at the time you saw the truck, it was already moving out into or trying to cross Alabama Highway 10?
“A. No. It wasn’t trying to cross. I’m misunderstanding what you was saying.
“Q. I got you. I want to make sure we’re clear.
“A. Okay. I’m misunderstanding what you said. When we was coming up, when we was coming up to the intersection, I didn’t never see it stopped behind the stop bar. It was already out into the road.”
Upon being questioned by her own counsel, Lewis testified as follows:
“Q. So you saw [the fire truck] moving from behind the stop sign all up to the point where /all ran into it, and it never stopped?
“A. Never stopped.”
The plaintiffs sued the fire department and White on January 9, 2013, asserting claims of negligence and wantonness and seeking damages for injuries sustained in the accident. The petitioners answered the complaint on February 6, 2013, generally denying the allegations and asserting certain affirmative defenses, including the immunity provided by § 6-5-336, Ala.Code 1975 (“the Volunteer Service Act”).
On April 23, 2014, the petitioners moved the trial court for a summary judgment, arguing, among other things, that they were entitled to the immunity provided by the Volunteer Service Act as to the negligence claims asserted against them.[2] The petitioners also argued that the alleged acts of misconduct upon which the plaintiffs based their wantonness claims did not rise to the level of wanton conduct. On August 14, 2013, the plaintiffs filed their response in opposition to the petitioners’ motion for a summary judgment. Following a hearing, the trial court, on August 17, 2014, entered an order denying the petitioners’ motion for a summary judgment. This petition for a writ of mandamus followed.

*331
Standard of Review

This Court has stated the following regarding the immunity exception to the general rule that an order denying a motion for a summary judgment is not renewable by a petition for a writ of mandamus and setting out the appropriate standard of review on a petition for a writ of mandamus:
“‘While the general rule is that the denial of a motion for summary judgment is not renewable, the exception is that the denial of a motion for summary judgment grounded on a claim of immunity is renewable by petition for writ of mandamus.' Ex parte Rizk, 791 So.2d 911, 912 (Ala.2000). A writ of mandamus is an extraordinary remedy available only when there is: ‘(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.’ Ex parte BOC Group, Inc., 823 So.2d 1270, 1272 (Ala.2001).”
Ex parte Nall, 879 So.2d 541, 543 (Ala.2003). This Court has also stated:
“[WJhether review of the denial of a summary-judgment motion is by a petition for a writ of mandamus or by permissive appeal, the appellate court’s standard of review remains the same. If there is a genuine issue as to any material fact on the question whether the movant is entitled to immunity, then the moving party is not entitled to a summary judgment. Rule 56, Ala. R. Civ. P. In determining whether there is a material fact on the question whether the movant is entitled to immunity, courts, both trial and appellate, must view the record in the light most favorable to the nonmoving party, accord the nonmoving party all reasonable favorable inferences from the evidence, and resolve all reasonable doubts against the moving party, considering only the evidence before the trial court at the time it denied the motion for a summary judgment. Ex parte Rizk, 791 So.2d 911, 912 (Ala.2000).”
Ex parte Wood, 852 So.2d 705, 708 (Ala.2002).

Discussion

The petitioners argue that the Volunteer Service Act immunizes them from liability in this case. The Volunteer Service Act provides, in pertinent part:
“(c) For the purposes of this section, the meaning of the terms specified shall be as follows:
“(1) Governmental Entity. Any county, municipality, township, school district, chartered unit, or subdivision, governmental unit, other special district, similar entity, or any association, authority, board, commission, division, office, officer, task force, or other agency of any state;
“(2) Nonprofit Corporation. Any corporation which is exempt from taxation pursuant to Section 501(a) of the Internal Revenue Code, 26 U.S.C. Section 501(a);
“(3) Nonprofit Organization. Any organization which is exempt from taxation pursuant to Section 501(c) of the Internal Revenue Code, 26 U.S.C. Section 501(c), as amended;
“(4) Volunteer. A person performing services for a nonprofit organization, a nonprofit corporation, a hospital, or a governmental entity without compensation, other than reimbursement for actual expenses incurred. The term includes a volunteer serving as a director, officer, trustee, or direct service volunteer.
*332 “(d) Any volunteer shall be immune from civil liability in any action on the basis of any act or omission of a volunteer resulting in damage or injury if:
, “(1) The volunteer was acting in good faith and within the scope of such volunteer’s official functions and duties for a nonprofit organization, a nonprofit corporation, hospital, or a governmental entity; and
“(2) The damage or injury was not caused by willful or wanton misconduct by such volunteer.
“(e) In any suit against a nonprofit organization, nonprofit corporation, or a hospital for civil damages based upon the negligent act or omission of a volunteer, proof of such act or omission shall be sufficient to establish the responsibility of the organization therefor under the doctrine of ‘respondeat superior,’ notwithstanding the immunity granted to the volunteer with respect to any act or omission included under subsection (d).”
§ 6-5-336, Ala.Code 1975. We address in turn both White’s status and the fire department’s status relative to the Volunteer Service Act.
7. White
In order for White to be immune under the Volunteer Service Act from liability based on his status as a volunteer (1) he must have been “acting in good faith and within the scope of [his] official functions and duties for a nonprofit organization, a nonprofit corporation, hospital, or a governmental entity,” and (2) the damage or injury made the basis of the action was not caused by White’s willful or wanton misconduct. § 6-5-336.
As discussed above, the fire department was incorporated specifically for the “purpose of forming a non-profit corporation ... exclusively for charitable ... purposes within the meaning of Section 501(c)(3) of the U.S. Internal Revenue Code of 1954.” The fire department has continuously served the community of Dixon Mills in that regard since its formation. The fire department does not compensate its firefighters for their services. Further, Dixon Mills is an unincorporated community and has no form of government. The fire department’s original source of funding consisted of donations of equipment from other fire departments. Accordingly, the fire department is a “nonprofit organization” as that term is defined in, and for purposes of, the Volunteer Service Act.[3]
' [4] White was a member of the fire department at the time of the accident, and he received no compensation for the services he performed for the fire department. At the time of the accident, White was operating the fire department’s fire truck, with lights displayed and sirens sounding, while ,en route to a structure fire. Clearly, White was acting in good faith and within the scope of his volunteer-firefighter duties with the fire department, *333 a nonprofit organization under the Volunteer Service Act, and thus would be liable to the plaintiffs only if he engaged in “willful or wanton misconduct.”
The determination of whether a party’s act constitutes willfulness or wantonness depends on the facts of each particular case. Ex parte Anderson, 682 So.2d 467 (Ala.1996).
‘“A majority of this Court, in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), emphasized that wantonness, which requires some degree of consciousness' on the part of the defendant that injury is likely to result from his act or omission, is not to be confused with negligence (i.e., mere inadvertence):
“ ‘ “Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability.' Implicit'in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
“ ‘ “Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act. ‘Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.’ McNeil v. Munson S.S. Lines, 184 Ala. 420, [423], 63 So. 992 (1913)....
[[Image here]]
“.““Willful and wanton conduct has a well-defined meaning at law. It is sometimes-expressed in terms of “reckless disregard of the safety of another.” Willful and wanton conduct should not be confused with negligence. It has been correctly stated that the two concepts are as “unmixable as oil and water.” ’
[[Image here]]
“““... Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, and strictly speaking, is not within the meaning of the, term “negligence,” which conveys the idea of inadvertence, as distinguished from premeditation or formed intention.’ ”
“ ‘510 So.2d at 145-46 (citations omitted). See also, Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989).’
“[Ex parte Anderson,] 682 So.2d [467] at 469-70 [(Ala.1996)].”
Phillips ex rel. Phillips v. United Servs. Auto. Ass’n, 988 So.2d 464, 467-68 (Ala.2008). In Ex parte Essary, 992 So.2d 5, 12 (Ala.2007), this Court explained:
“The evidence, viewed, as it must be, in a light most favorable to the plaintiffs, the nonmovants, shows that Es-sary slowed to a ‘rolling stop’ at the intersection and attempted to cross the intersection between two moving vehicles. The plaintiffs’ characterization of Essar/s attempt to cross the intersection between two vehicles as ‘accelerating’ after a ‘rolling stop’ to ‘shoot the gap’ does not elevate Essary’s actual conduct — as observed by the plaintiffs— from the negligent failure' to exercise good judgment to a wanton act consti *334 tuting reckless indifference to a known danger likely to inflict injury. At best, the plaintiffs’ evidence shows that Essary, like the defendant in Wilson [v. Cuevas, 420 So.2d 62 (Ala.1982) ], made an error in judgment when he attempted to ‘beat the traffic’ or ‘shoot the gap’ by passing between Banks’s vehicle and Burrell’s vehicle. Wilson holds that such conduct is not wanton.
“Although the evidence indicates that Essary knowingly entered the intersection, there is nothing from which the trier of fact could infer that, in moving his vehicle through the intersection, Es-sary’s state of mind contained the requisite consciousness, awareness, or perception that injury was likely to, or would probably, result. Indeed, the risk of injury to Essary himself was as 'real as any risk of injury to the plaintiffs. Absent some evidence of impaired judgment, such as from the consumption of alcohol, we do not expect an individual to engage in self-destructive behavior. See Griffin Lumber Co. v. Harper, 252 Ala. 93, 95, 39 So.2d 399, 401 (1949) (‘There is a rebuttable presumption recognized by the law that every person in possession of his normal faculties in a situation known to be dangerous to himself, will give heed to instincts of safety and self-preservation to exercise ordinary care for his own personal protection. It is founded on a law of nature and has [as] its motive the fear of pain or death. Atlantic Coast Line R. Co. v. Wetherington, 245 Ala. 313(9), 16 So.2d 720 [ (1944) ].’).
“The facts here presented do not establish any basis from which to conclude that Essary was not possessed of his normal faculties, such as from voluntary intoxication, rendering him indiffei'ent to the risk of injury to himself when crossing the intersection if he collided with another vehicle. Nor is the act as described by Burrell so inherently reckless that we might otherwise impute to Es-sary a depravity consistent with disregard of instincts of safety and self-preservation. We therefore conclude that, as a matter of law, the plaintiffs failed to offer substantial evidence indicating that Essary was conscious that injury would likely or probably result from his actions.”
(Some emphasis added.)
Here, when White approached the intersection in the fire truck, the lights and sirens on the fire truck were activated. White testified that as he approached the intersection of Highway 10 and County Road 6 he began slowing down and brought the fire truck to a complete stop at the stop sign on County Road 6; that he then let some traffic on Highway 10 clear and eased the truck forward in order to get a better line of sight both east and west along Highway 10; that he brought the fire truck to a complete stop again; that when he saw no approaching vehicles he proceeded through the intersection and across Highway 10; that, at that moment, firefighters Clark and Maye shouted to him that a vehicle was approaching; and that, having already committed to proceeding through the intersection, he accelerated in an attempt to clear the intersection before making contact with the plaintiffs’ oncoming vehicle. Both firefighters Clark and Maye stated thatsWhite brought the fire truck to a complete stop at the stop sign before proceeding through the intersection and across Highway 10.
Westbrook testified that when he first saw the fire truck it was already proceeding through the intersection and that he did not know whether the fire truck had stopped at the stop sign on County Road 6. Lewis’s testimony on this issue is contradictory. She initially testified that when *335 she first saw' the fire truck it was proceeding through the intersection and had already' entered Highway 10, the implication being that, like Westbrook, she did not know whether the fire truck had stopped at the stop sign. She specifically testified that she never saw the fire truck behind the stop sign. However, upon subsequent questioning by her attorney, Lewis testified that she saw-the fire truck moving at a point before the stop sign and that it never stopped before it entered the intersection.
Although the evidence indicates that White knowingly entered the intersection, nothing in the evidence indicates that White acted willfully or wantonly in doing so, i.e., there is nothing from which the trier of fact could infer that, in moving the fire truck through the intersection, White’s “state of mind contained the requisite consciousness, awareness, or perception that injury was likely to, or would probably, result” Ex parte Essary, 992 So.2d at 12.
Accordingly, we conclude that White’s actions were not willful or wanton and that he is entitled to the immunity afforded a volunteer by the Volunteer Service Act.

II. The Fire Department

Relying upon this Court’s decisions in Hollis v. City of Brighton, 885 So.2d 135 (Ala.2004), and Ex parte Labbe, 156 So.3d 368 (Ala.2014), the petitioners argue that the fire department “fall[s] within the legislature’s intended class of persons to be protected by the Volunteer Service Act.” We disagree.
In Hollis, homeowners sued the City of Brighton, alleging that its volunteer fire department negligently failed to extinguish a fire that destroyed their house. The homeowners- alleged that the City was liable for negligence because, they argued, by establishing a fire department, the City undertook a duty to provide the homeowners with skillful fire protection, and it then breached that duty through the unskillful acts or omissions of the City-created volunteer fire department in responding to the fire that destroyed their house’. In addition, the homeowners claimed that the City was vicariously liable on a negligence or wantonness theory based on the same unskillful acts or omissions of the members of the'fire department. The City moved the trial court for a summary judgment, arguing that the Voluntary Service Act immunized the volunteer firefighters individually and that their immunity protected them from liability and thereby protected the City from vicarious liability for the firefighters’ torts. The trial court entered a summary judgment for the City. Hollis, supra.
In affirming the summary judgment for the City, this Court stated:
“[T]he firefighters, the putative servants in the case now before us, were volunteers who did not receive compensation for their service as volunteer firefighters. Consequently, they were immune from liability for negligence under the Volunteer Service Act. Because the firefighters were immune from liability for negligence under the Volunteer Service Act, no liability for negligence could befall them to be visited upon the City, the putative master in the case now before us. While the [homeowners] allege not only negligence but also wantonness by the firefighters, and while § 6-5-336 excepts wanton volunteers from the immunity, a city cannot be liable for wanton conduct. Town of Loxley v. Coleman, 720 So.2d 907, 909 (Ala.1998), and Hilliard v. City of Huntsville, 585 So.2d 889, 892 (Ala.1991).”
Hollis, 885 So.2d at 142.
In Ex parte Labbe, the plaintiffs sued the City of Valley Grande and its mayor asserting various claims, including negli- *336 genee and wantpnness, arising out of the alleged negligent removal of the bodies of the plaintiffs’ family members from a fire scene by the City of Valley Grande volunteer fire department. The City had entered. into a contract with the Valley Grande volunteer fire department, pursuant to which the fire department agreed to provide fire-protection service to the City. The. City and its- mayor moved the trial court for a summary judgment, arguing, among other things,-.that they were.entitled to immunity under the Volunteer Service Act. The trial court denied the City and the mayor’s motion for a summary judgment, and the City and the mayor filed a petition for a writ of mandamus with is Court.
The City and the mayor, relying upon this Court’s decision in Hollis, argued in their petition for a writ of mandamus that the volunteer firefighters were immune from suit under the Volunteer Service Act and that, because the individual firefighters were immune from suit, the City and the mayor were' protected from vicarious liability for the firefighters’ negligent acts. The plaintiffs sought to circumvent the immunity afforded by the Volunteer Service Act by arguing that the fire department was not a volunteer department within the meaning of the Volunteer Service Act but, rather, was a professional fire department operating under the control of the City. The plaintiffs based their argument on the contractual relationship that existed between the City and the fire department and certain annual donations made to the fire department by the City.
This Court concluded that the agreement between the City and the fire department did not alter the fire department’s “volunteer” status. Having determined that the fire department was a “volunteer” fire department, we concluded that its firefighters were volunteers immune from liability for their negligent acts under the Volunteer Service Act. Because the firefighters were immune from liability for their negligent .acts, we concluded that, pursuant to Hollis, the City and the mayor were likewise immune from liability for the negligent acts of the firefighters. Ex parte Labbe, 156 So.3d at 373-74.
It apipears from the pétitioners’ reliance upon Hollis and Ex parte Labbe that they are claiming that the fire department is vicariously immune from liability for White’s allegedly negligent acts based on its respondeat superior relationship with White. This argument fails for a couple reasons. First, section (e) of the Volunteer Service Act expressly provides that a nonprofit organization may be held liable for the negligent act or omission of a volunteer, based upon the doctrine of respon-deat superior, regardless of the immunity afforded the volunteer under the section (d) of the Act. Section (e) of the Volunteer Service Act specifically provides:
“In any suit against a nonprofit organization, nonprofit corporation, or a hospital for civil damages based upon the negligent act or omission of a volunteer, proof of such act or omission shall be sufficient to establish the responsibility of the organization therefor under the doctrine of ‘respondeat superior,’ notwithstanding the immunity granted to the volunteer with respect to any act or omission included under subsection (d).”
Second, Hollis and Ex parte Labbe are easily distinguishable from the present case. In those cases the plaintiffs sued municipalities based on the alleged tortious acts, of their volunteer firefighters. As discussed above, this Court found that the volunteer firefighters enjoyed immunity under the Volunteer Service Act and, therefore, that the municipalities likewise enjoyed immunity, from the firefighters’ tortious acts based on. the master-servant *337 relationship that existed between the two. Here, the plaintiffs did.not. sue a.municipality; rather, they sued the fire department, an organization that has been expressly foreclosed, under section (e) of the Volunteer Service Act, from vicariously sharing immunity with the, firefighters based on the master-servant relationship.
Accordingly, we conclude that the petitioners have failed to establish a clear legal right to the relief sought as it pertains to the fire department.

Conclusion

The petitioners have established a clear legal right to the relief sought as to White. The petitioners, however, have failed to establish a clear legal right to the relief sought as it pertains to the fire department. Accordingly, we grant the petition for a writ of mandamus in this case as to White and direct the trial court to enter a summary judgment for him on the negligence claim. We deny the petition for a writ of mandamus as to the fire department.
PETITION GRANTED IN'PART AND DENIED IN PART; WRIT ISSUED.
STUART, PARKER, MURDOCK, SHAW, MAIN, WISE, and BRYAN, JJ., concur.

'. Baker testified that Marengo County does not have a fire district and'that the fife department is not a member of a fire district, i.e., it is not an "other special district.” See the Volunteer Sendee Act, § 6-5-336(c)(1). Ala.Code 1975.

. The petitioners also argued that White was immune from liability on the negligence claims under § 6-5-335, Ala.Code 1975, and that the fire department was immune from liability on the negligence claims pursuant to § 11-89-15, Ala.Code 1975. The petitioners concede on appeal that they are not entitled to the immunity provided by those statutoiy provisions.

. The petitioners, relying upon the fact that they receive some funding from the countywide tax initiative and upon the County Commission’s “blessing and support" of the fire department's fire-fighting initiative by way of its approval of the fire department’s agree- ■ ment with the Alabama Forestry Commission, argue for the first time in their reply brief that the fire department is also a “governmental entity" as that term is defined in the Volunteer Service Act and is entitled to immunity in that capacity. However, “[i]t is a well-established principle of appellate review that we will not consider an issue not raised in an appellant’s initial brief, but raised only in the reply brief.” Lloyd Noland Hosp. v. Durham, 906 So.2d 157, 173 (Ala.2005). Accordingly, we will not address the petitioners’ argument that, in addition to its status as a nonprofit organization, the fire department is also a governmental entity entitled to immunity un.der the Volunteer Service Act.