MURDOCK, Justice.
*171 Mazda Motor Corporation ("Mazda") appeals from a judgment entered against it on two jury verdicts resulting from two complaints asserting product-liability claims filed in the Jefferson Circuit Court. The claims stem from a single-car accident that occurred on November 22, 2010, involving a 2008 Mazda3 automobile driven by Sydney McLemore ("Sydney") in which Natalie J. Hurst ("Natalie") was a passenger. We affirm in part, reverse in part, and remand.
I. Facts
On the night of November 21, 2010, 15-year-old Natalie was spending the night with Sydney at the McLemore residence. At approximately 3:00 a.m. on November 22, 16-year-old Sydney was driving the vehicle; Natalie was in the front passenger seat. The vehicle was traveling on Ross Bridge Parkway heading south in the 4900 block when Sydney lost control of it. The applicable speed limit was 35 m.p.h.; it was estimated at trial that the vehicle was traveling at a speed of 55 to 60 m.p.h. when Sydney lost control. Initially, the vehicle hit a curb and Sydney "overcorrected," causing the vehicle to begin spinning. The vehicle hit a light pole on the driver's side of the vehicle at a speed of 30 to 35 m.p.h. It spun around the pole before coming to a stop and bursting into flames.
At trial, the plaintiffs' medical expert testified that both Sydney and Natalie survived the impact with non-life-threatening injuries. Sydney managed to get out of the vehicle, but not before suffering third-degree burns to her back, trunk, neck, right arm, and hand, covering approximately 15 percent of her body's surface. Natalie did not escape the vehicle and died from burn injuries.
On August 2, 2012, John Hurst and Barbara Hurst ("the Hursts"), Natalie's parents, filed an action in the Jefferson Circuit Court against Mazda and Sydney. The complaint asserted wrongful-death claims against Mazda based on the Alabama Extended Manufacturer's Liability Doctrine ("the AEMLD") and on the alleged negligence and wantonness of Mazda and a wrongful-death claim against Sydney based on her alleged negligence. With regard to Mazda, the Hursts alleged that the 2008 Mazda3 was not crashworthy because its fuel system was defectively designed.[1] Specifically, they alleged that Mazda erred by designing the 2008 Mazda3 so that a plastic fuel tank was positioned one-half inch from a steel muffler that had sharp protruding edges. The complaint alleged that, when the vehicle hit the pole, the muffler smashed into the fuel tank and the muffler's sharp edge cut the fuel tank, causing the fuel tank to fail and allowing gasoline vapors to escape and to ignite, *172 which caused the post-collision fuel-fed fire.
In November 2012, Sydney, through her father Richard McLemore, and Richard McLemore individually (collectively "the McLemores"), filed a cross-claim against Mazda in which they also alleged AEMLD, negligence, and wantonness claims. The McLemores' complaint alleged the same design defect as did the Hursts' complaint. The McLemores sought only damages for Sydney's fire-related injuries.
Before trial, the Hursts settled their negligence claim against Sydney with the McLemores' insurance company for $100,000 and dismissed their negligence claim against her. The Hursts also dismissed their negligence and wantonness claims against Mazda, leaving to be tried only their AEMLD wrongful-death claim against Mazda. The McLemores dismissed their negligence claim against Mazda, but they maintained their wantonness and AEMLD claims against Mazda.
The trial lasted 11 days. The Hursts and the McLemores (hereinafter referred to collectively as "the plaintiffs") presented testimony from 15 witnesses that included, among others, a medical expert, an accident-reconstruction expert, a fire-causation expert, and a causation-and-design-defect expert. A proper understanding of Mazda's arguments in this appeal and of some of the responses presented by the plaintiffs necessitates that we describe in detail some of the trial testimony and evidence.
At the time the Mazda3 model at issue was designed and manufactured, Ford Motor Company ("Ford") owned approximately one-third of Mazda. The Mazda3 was jointly designed by Ford and Mazda. The Ford Focus automobile and the Mazda3 were built on the same platform but were sold under different brand and model names. It is undisputed that Mazda designed the fuel system of the Mazda3. The muffler in the subject Mazda3 model was made of steel, was rectangular, and was surrounded by a sharp edge called a flange. The muffler was placed next to a high-density polyurethane ("HDPE") fuel tank; the two components were within one-half inch of each other. A thin aluminum heat shield ran the length of the exhaust system between the muffler and the fuel tank. The heat shield was designed to protect the fuel tank from the heat generated by the exhaust.
The plaintiffs introduced evidence of a survey of 80 automobiles similar in size and model year to the subject Mazda3, revealing that all but three had designs in which the mufflers were located behind the rear axle and the fuel tanks were located in front of it, i.e., the rear suspension was between the two components and they were not adjacent to one another.[2] The plaintiffs introduced a picture from the service manual of a Mazda3 model that depicted the muffler located behind the rear axle, close to the rear tip of the exhaust pipe. The plaintiffs also introduced evidence indicating that a version of the Mazda3 produced only for California during the relevant period had a rounded muffler with no sharp edge. The Ford Focus designed and manufactured during the relevant period also had a muffler with a smooth, rounded surface area.
Mazda countered by introducing evidence indicating that in the same period during which the subject Mazda3 was designed and manufactured, four other automobile models had a design in which a flanged muffler was placed next to a fuel *173 tank: the 1997 Volkswagen Jetta, the 2000 BMW 323, the 2008 BMW 328, and the 2008 BMW 528.[3]
Michael Schulz, the plaintiffs' "fire-cause-and-origin" expert, testified as follows:
"So my opinion is that the origin of this fire is at the inboard side of the muffler where it impacted and intruded to the left side or the driver's side of the plastic fuel tank.
"I cannot tell you from the fire patterns whether it is that seam or flange that sticks out, which is very sharp-if you run your hand on it, it is very sharp, and you would slice open your finger-or whether it is the connection where the inlet pipe comes into the muffler, because they are both within the area of the fire patterns. It is one or the other or a combination of the two. I cannot make the distinction for you."
Schulz further testified that pinpointing whether the cause of the fire was the connection from the inlet pipe or the flange on the muffler was difficult because the fuel tank had disintegrated in the fire. He noted, however, that following the accident the muffler was positioned where the fuel tank had been located.
Mazda's "fire expert" testified that he believed the fire originated from the fuel lines. Schulz expressly rejected such a possibility, stating that "all of these fire patterns come from the area occupied by the fuel tank and not the area occupied by the fuel lines." More specifically, Schulz stated that the fire patterns
"come out of this fuel tank on the side here. It did not come out in the front here, where these fuel line connections are. It is along the side. And the only plausible mechanism that we see there are the sharp edges on that fuel tank seam and the flange of that fuel tank."[4]
In this appeal, Mazda does not challenge Schulz's testimony.
Jerry Wallingford testified as a "design-defect-and-causation" expert on behalf of the plaintiffs. At the time of trial, Wallingford was a senior forensic engineer with Verifact Corporation. Wallingford testified that he is trained in mechanical engineering, failure analysis, and fire-safety analysis and that he has over 40 years' experience in the automotive industry. Wallingford has worked for Ford, Clark Equipment Company, and EG & G Automotive Research, Inc., the last of which has one of the world's largest automotive-test facilities. At Ford, Wallingford was a developmental engineer in the durability-test department performing vehicle tests intended to reveal potential design failures. He is a member of the Society of Automotive Engineers ("SAE"), and he serves on the SAE's Fire Safety Committee and the Crash Data and Analysis Committee. Wallingford has written and published several peer-reviewed articles about automotive design and testing, including one paper specifically concerning fuel spills in post-collision fuel-fed fires. Wallingford has investigated between 100 and 150 post-collision vehicular fires that involved some aspect of the fuel system.
Wallingford testified that he reached his conclusions based on his examination of *174 the vehicle involved in this case and on a scan and measurement of an exemplar Mazda3. He also reviewed photographs of the subject Mazda3 at the scene of the accident. He further considered testimony from those on the scene, the opinions of the plaintiffs' accident reconstructionist Ron Kirk and fire-cause-and-origin expert Schulz. Wallingford also testified that, using his knowledge and experience, he employed principles from "failure analysis" and "hierarchy of design." At trial, Wallingford explained "failure analysis" as follows:
"Failure analysis kind of flops over on accident reconstruction because I kind of have to do two of them. During an accident, there's always three phases that we need to look at.
"We need to know what happened during the event itself, but equally as important, what was going on before the event occurred, the accident, the impact, and then what happened immediately afterwards, how did the vehicle move and so forth.
"And failure analysis is looking at various components that most often we think of as breaking or failing and ascertaining through a system of utilizing a scientific method whether that component failed before the event, during the event, or after the event. And the after the event, most often we think about when debris was picked up, did somebody pull on stuff the wrong way and break it.
"So in failure analysis, we really hone in on the physical evidence, and we try to establish the probabilities of the types of failure. And then after going through a hypothesis that we test, we establish what most probably occurred during the event."
Wallingford also explained what "hierarchy of design" entails. He testified that it is a process for designing a product that is initially taught in "college level courses of engineering." He explained that "hierarchy of design" involves a four-step process of eliminating a problem in the design of a product. The first step is to "design the problem away." If that cannot be done, the next step is to "guard the problem away on the piece of equipment." The third step is to "warn the user of the hazards." If none of those steps adequately addresses the safety concern, the final step is not to release the product. Wallingford specifically testified that "hierarchy of design" is something automobile manufacturers employ in evaluating "fuel system integrity or crashworthiness."[5]
Applying the foregoing information and tools, Wallingford testified that during the crash the muffler moved "a foot and a half" inward toward the fuel tank and that the sharp edge of the muffler "cut" the fuel tank, allowing gas vapors to escape the tank, and that those vapors ignited to cause the fire.
On cross-examination, Mazda's counsel asked Wallingford if he had performed any *175 tests using an exemplar muffler and fuel tank to verify his theory. Wallingford admitted he had not performed such tests, and he offered two reasons for not doing so. First, he stated:
"No, sir, it wasn't necessary. Utilizing the principles, the scientific method and realizing the number of cases I have performed testing in the past, I proved the hypothesis by a deductive process. There's no question when I move a fuel tank, excuse me, when I move a sharp object, in this case the muffler, a foot to a foot and a half into the space of a liquid container that can easily be cut, there was a failure."
Second, Wallingford explained:
"We're not talking about a situation in which we simply push [the muffler] in [the fuel tank]. We have a situation where the muffler cut ... as it moved in and rotated rearward. Without knowing the exact angles that it rotated ..., we cannot accurately replicate this accident event.
"Q. Could you have rotated this muffler edge against the fuel tank, designed such a test so that the jury could see whether or not it is susceptible to cutting, as you say it is?
"A. No sir. I could do a test, but it would not replicate the movement that actually occurred in this event, because I cannot tell you exactly how the muffler moved. All I can tell you is it rotated in and back, creating a cutting surface.
"Q. All right.
"[A.] You can generate a test to do almost anything, but the problem is, it needs to represent something relatively close to the events that occurred in the subject accident."
Wallingford also testified that the fuel and exhaust system in the subject Mazda3 was defectively designed. In reaching that conclusion, Wallingford relied primarily on some Ford documents written by Michael Harrigan, a senior fuel-systems specialist for Ford.[6] The documents were intended for use in educating Ford fuel-system engineers. Wallingford testified that "the purpose of the documents was to educate [fuel-system engineers] on ... safe fuel systems" and that the documents "contain information relative to the industry standards used for fuel system design in the late '90's and early 2000's." He also stated that the documents "generally" evidence what he understood "to be universally accepted standards in the auto industry." Wallingford added that the documents were "a guideline to be utilized throughout Ford Motor Company, all the vehicular lines, for the purpose of making a better, more effective, safer fuel system." More generally, "[t]hese were meant to make Ford vehicles and Ford-related at that point in time, Mazda vehicles, safer." He admitted, however, that the documents were "generated within Ford Motor Company" and that they were not distributed to the auto industry as a whole. Still, Wallingford emphasized that, "although they are specific to Ford Motor Company," based on his knowledge and experience, the Ford documents "generally embody what would be considered the standard for designing fuel systems and their components within the industry."
The Ford documents stated in a section titled "Clearance and Friendly Surfaces" that "[a]ny component that impinge[s] should have smooth, rounded surfaces next to the [fuel] tank." Second, the documents stated that engineers should "[e]nsure that *176 trim edges and flanges do not project in the direction of the fuel system components, both before and after crash tests." Third, they stated that any "[s]hields should be steel and have a material hardness which exceeds that of adjacent components." Wallingford specifically testified that the heat shield between the muffler and the fuel tank was not harder than the muffler and that it could not have prevented the muffler from impinging on the fuel tank. More generally, the Ford documents stated: "Fuel system crash integrity also provides occupant protection by preventing fuel-fed post-crash fires. Fuel system integrity is easiest to achieve if there is little or no deformation of the fuel system components during the crash event."
Wallingford testified that the exhaust and fuel system in the subject Mazda3 violated the guidelines in the Ford documents. He explained that it violated the guidelines by placing a heavy steel muffler with a sharp edge within one-half inch of the fuel tank, by pointing the sharp edges of the muffler in the direction of the fuel tank, and by lacking a steel shield to protect the plastic fuel tank from the steel muffler in the event of a crash.
Tom Patterson, a design expert presented by Mazda, admitted that the Ford documents contained "guidelines" that had "been around since at least the '70s." Patterson also conceded that the design of the muffler and its placement in the subject Mazda3 violated the guidelines in the Ford documents, but he also said that those guidelines were pre-collision goals and that those goals could not be attained in an accident as severe as the one that occurred in this case. Patterson testified that it is the practice throughout the automotive industry to put the muffler behind the rear axle and the fuel tank in front of the rear axle, but he explained that the reason for this was not fuel-system integrity but, rather, a concern about noise for front-seat passengers. He stated:
"The gas tank is almost always in front of the rear axle, and it's been the practice in the industry for a variety of reasons. Number one, as far as the muffler is concerned, noise abatement to, of course, put it in the rear-at the rear of the axle because you want it as close as possible to the end of the exhaust pipe, end of the exhaust system. And that's so that it can attenuate the noise that develops throughout that exhaust pipe all the way from the engine back to the rear.
"So you want it in the furthermost position rearward to successfully attenuate all those undesirable vibrations and noise that you get in the exhaust system. So, yeah, it's always put back there when you can.
"Q. ... It is the practice in the industry, in the automotive industry, to place the muffler aft of the rear axle and the tank in front of the rear axle, isn't it?
"A. By virtue of the fact that aft of the rear axle gets that muffler closest to the end of the exhaust system, that's true."
Wallingford suggested that the California Mazda3 design was a function of the unique emissions standards applicable in California, stating: "California has different emissions requirements than the rest of the world, different NORD requirements, so very often California emission carburetion exhaust system has what we call a different calibration. It requires different components."
At the close of the plaintiffs' case-in-chief and at the close of all the evidence, Mazda moved for a judgment as a matter of law as to all of the plaintiffs' claims, but the trial court denied Mazda's motions. Before deliberations, Mazda requested that the trial court instruct the jury on contributory negligence and/or product *177 misuse as a defense to the McLemores' AEMLD claim. The trial court refused the requested instructions.
The jury deliberated for three days before rendering a verdict in favor of the Hursts and Sydney. The jury awarded the Hursts wrongful-death damages in the amount of $3.9 million (subtracting from a $4 million award the $100,000 received from the settlement with Sydney); the jury awarded Sydney $3 million in compensatory damages and $3 million in punitive damages.[7]
After the trial, Mazda filed postjudgment motions, including a motion for remittitur of the damages awards. Following a hearing, the trial court denied Mazda's postjudgment motions. Mazda appealed.
II. Analysis
A. The Admission of Jerry Wallingford's Testimony
Mazda first contends that the trial court erred in refusing to exclude the testimony of Wallingford, the plaintiffs' design-defect-and-causation expert, because, it says, his testimony should have been considered "scientific testimony" under Rule 702(b), Ala. R. Evid., and his testimony did not meet the requirements of that rule.
" '[A]n expert witness' competence to testify is an inquiry substantially within the discretion of the trial judge. [An appellate court] will not disturb the trial judge's finding of expert qualifications vel non, unless there is a clear abuse of this discretion.' " Slay v. Keller Indus., Inc., 823 So.2d 623, 625 (Ala. 2001) (quoting Cobb v. State, 50 Ala.App. 707, 710, 282 So.2d 327, 329 (1973) ).
1. Timeliness of Mazda's Objection
Before we address the substance of Mazda's contention, we note that the Hursts and Sydney argue that Mazda did not preserve this issue for appeal. It is undisputed that before trial Mazda filed a motion in limine titled "Motion to Preclude Testimony of Jerry Wallingford" in which Mazda contended that Wallingford's testimony was due to be excluded because, it said, his testimony did not meet the requirements of Rule 702(b).[8] In its "Preliminary *178 Rulings on All Pending Motions" issued before trial, the trial court denied Mazda's motion to exclude Wallingford's testimony, stating that "[t]he Court finds that the Daubert [9 ] provisions of Rule 702(b) are inapplicable as Wallingford's opinions and testimony do not involve scientific evidence."
The Hursts and Sydney note that
" '[a]n appellant who suffers an adverse ruling on a motion to exclude evidence, made in limine, preserves this adverse ruling for post-judgment and appellate review only if he objects to the introduction of the proffered evidence and assigns specific grounds therefor at the time of the trial, unless he has obtained the express acquiescence of the trial court that subsequent objection to evidence when it is proffered at trial and assignment of grounds therefor are not necessary.' "
Baldwin Cty. Elec. Membership Corp. v. City of Fairhope, 999 So.2d 448, 454 (Ala. 2008) (quoting Owens-Corning Fiberglass Corp. v. James, 646 So.2d 669, 699 (Ala. 1994), citing Liberty Nat'l Life Ins. Co. v. Beasley, 466 So.2d 935 (Ala. 1985) ). Mazda did not obtain express acquiescence from the trial court that it need not renew its objection to Wallingford's testimony at trial.
Wallingford presented his testimony on October 3, 2014, the fifth day of trial. During his testimony, Mazda objected to the use of the Ford documents, an objection the trial court overruled, but Mazda did not specifically object to Wallingford's testimony about the cause of the fire on the ground that it constituted "scientific evidence" under Rule 702(b). Following Wallingford's testimony, the plaintiffs introduced one witness's videotaped deposition, which concluded that day's testimony. At the beginning of the next trial day, Monday, October 6, 2014, Mazda filed a renewed motion to strike Wallingford's testimony. The parties waited to argue that motion until the close of the plaintiffs' case.
At the close of the plaintiffs' case, Mazda filed a motion for a judgment as a matter of law in which it also challenged Wallingford's testimony as failing to meet the requirements of Rule 702(b). The trial court then heard arguments from the parties on Mazda's renewed motion to exclude Wallingford's testimony. During this exchange, the plaintiffs argued that Mazda's objection was not timely. The trial court expressly concluded that "[Mazda] made a timely objection. [It] didn't want [Wallingford] to get up there and testify at all." The trial court then reviewed its notes about Wallingford's testimony, and it concluded that Wallingford "didn't testify to any type of scientific principles. He just made his observations based upon his forty years of experience and his knowledge of the automotive industry and his observations of data that he had been given by others." Accordingly, the trial court denied the motion and stated: "Again, it is on the record now, both of you. Let's go on to something else that you all might be able to change my mind on."
At the close of all the evidence, Mazda filed a "Renewed Motion for a Judgment as a Matter of Law" in which it again challenged Wallingford's testimony. The *179 trial court denied the motion. Following the jury verdict, Mazda filed its postjudgment motion, in which it yet again challenged Wallingford's testimony. In its order denying Mazda postjudgment motion, the trial court did not rule that Mazda had failed to preserve its objection to Wallingford's testimony. Instead, it concluded that Wallingford's testimony met the requirements of both Rule 702(a) and 702(b) and that, therefore, the court did not err in admitting his testimony.
Based on the foregoing, we conclude that Mazda preserved its objection to Wallingford's testimony. " 'The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.' " Ex parte Parks, 923 So.2d 330, 333 (Ala. 2005) (quoting Ex parte Works, 640 So.2d 1056, 1058 (Ala. 1994) ). In this case, the trial court clearly was on notice of Mazda's specific objection to Wallingford's testimony, and it expressly concluded that Mazda had provided a timely objection to that testimony. We agree.
2. Substance of Mazda's Objection to Wallingford's Testimony
Turning then to the substance of Mazda's objection, Rule 702, Ala. R. Evid.,[10] provides:
"(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
"(b) In addition to the requirements in section (a), expert testimony based on a scientific theory, principle, methodology, or procedure is admissible only if:
"(1) The testimony is based on sufficient facts or data;
"(2) The testimony is the product of reliable principles and methods; and
"(3) The witness has applied the principles and methods reliably to the facts of the case."
Mazda does not dispute that Wallingford is a qualified expert. It contends only that Wallingford's testimony does not meet the more stringent requirements of Rule 702(b). Significantly, Mazda does not argue that Wallingford's testimony should have been subject to the requirements of Rule 702(b) because it was"expert testimony based on a scientific theory, principle, methodology, or procedure." Instead, it contends that Rule 702(b) should apply because "Mr. Wallingford repeatedly represented his own opinion to be 'scientific.' " In other words, according to Mazda, whether Wallingford's testimony actually was scientific in nature is irrelevant; all that matters is that Wallingford purportedly portrayed his opinion to be scientific in nature, and the trial court therefore should have subjected it to the requirements of Rule 702(b).
Mazda argues that Rule 702(b) must apply because otherwise an expert could "claim[ ] the mantle of science,"
"even though he hasn't satisfied the heightened Rule 702(b) requirements applicable to 'scientific' evidence. The *180 party proffering the expert's opinion-here, the plaintiffs-would get the 'bump' that accompanies purportedly 'scientific' testimony without having to prove its reliability, and the objecting party-here, Mazda-would suffer unfair prejudice."
Some authorities support Mazda's position. An article discussing the amendment to Rule 702 that added part (b) to that rule states:
"As amended, Rule 702 requires courts to make two separate but related determinations regarding scientific evidence. First, pursuant to the first sentence in Rule 702(b), the trial court must determine whether proffered expert testimony purports to be scientific. [See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), (observing that the Federal Rules of Evidence place limits on the admissibility of 'purportedly scientific evidence.' (emphasis added).) Cf. Swanstrom v. Teledyne Cont'l Motors, Inc., 43 So.3d 564, 580 (Ala. 2009) ('[A] person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the expert is testifying.' (quoting Slay v. Keller Indus., Inc., 823 So.2d 623, 626 (Ala. 2001) ) [emphasis added] ).] If so, a Daubert admissibility inquiry is triggered, and the trial court then must determine whether the purportedly scientific evidence is 'reliable'-that is, meets the three-pronged admissibility standard imposed by Rule 702(b)(l)-(3)."
Robert J. Goodwin, An Overview of Alabama's New Daubert -Based Admissibility Standard, 73 Ala. Law. 196, 199 (May 2012).
Professor Terrence W. McCarthy has filed an amicus curiae brief in this case, and his argument echoes Mazda's position:
"In Alabama, one critical means of safeguarding that legitimacy is through careful application of Rule 702(b)'s Daubert standard, which places the trial judge in the role of gatekeeper. The purpose of the Daubert analysis is to 'ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation "expert testimony." ' Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotation and citation omitted).
"This purpose would be thwarted if an expert witness, like Mr. Wallingford in this case, could claim the 'mantle of reliability,' id., by telling jurors that he is engaged in 'science' without the court's having held him to the exacting Daubert standard that applies to scientific testimony. To be clear, this is not just an issue of fairness to litigants, but also (and perhaps more importantly) an issue of systemic reliability. Allowing an expert to escape Rule 702(b) scrutiny in this manner risks misleading jurors, who will almost certainly place a great deal of weight on a purportedly 'scientific' expert opinion."[11]
*181 Both Mazda and Professor McCarthy rely heavily on Michigan Millers Mutual Insurance Corp. v. Benfield, 140 F.3d 915 (11th Cir. 1998), to support their interpretation of Rule 702(b).[12] Benfield tracks the same reasoning found in the foregoing arguments, i.e., that an expert who couches his or her opinion as "scientific" must be subjected to the Daubert standard regardless of whether that expert actually claims to, or does, rely upon a scientific theory, principle, methodology, or procedure in reaching his or her conclusions. In Benfield, the trial court excluded the testimony of a homeowner's insurance company's fire-origin expert under the Daubert standard. On appeal, the insurer contended that "the testimony of their expert was not based on scientific principles but rather was based on his years of experience, and on his skill and experience-based observations," and so it should not have been excluded. 140 F.3d at 920. The United States Court of Appeals for the Eleventh Circuit disagreed, reasoning:
"We do not hesitate in finding that Buckley's testimony was science-based, rather than experience-based, and as such is subject to Daubert's inquiry regarding the reliability of such testimony. See Carmichael [v. Samyang Tire, Inc.], 131 F.3d [1433,] 1435 [ (11th Cir. 1997) ]. Unlike the expert witness in Carmichael, who made no pretense that he was basing his testimony on anything other than his own experience in analyzing failed tires, Buckley held himself out as an expert in fire sciences, and testified that he could determine the origin of the fire through his knowledge of the science of fires. During his direct examination, Buckley testified that he had complied with the scientific method within his field of science in determining the cause and origin of the fire. Moreover, counsel for Millers, in their briefs to this court filed before Carmichael was issued, took pains to stress the scientific nature of Buckley's inquiry into the fire's origin. The use of 'science' to explain how something occurred has the potential to carry great weight with a jury, explaining both why counsel might seek to couch an expert witness's testimony in terms of science, as well as why the trial judge plays an important role as the gate-keeper in monitoring the evidentiary reliability of such testimony. See Daubert, 509 U.S. at 590, 113 S.Ct. at 2795. Because of the manner in which this expert's testimony was presented to the jury, we find no error by the trial court in determining Daubert applied to the testimony at issue."
140 F.3d at 920 (some emphasis added).
Although the point made in Benfield about avoiding juror confusion may be well taken, there are significant differences between Benfield and this case that render its reasoning inapplicable here. First, the plaintiffs in this case never argued that Wallingford's inquiry was a scientific one as defined in Rule 702(b). In fact, when Mazda's counsel attempted to label Wallingford's *182 conclusions as "science" during Wallingford's deposition, the McLemores' counsel specifically objected to that characterization:
"A. [Wallingford:] Nobody can ever say, ah, I know what that number is.
"Q. [Mazda's counsel:] No, I agree. If you're going to offer scientific testimony or if you're going to offer a recommendation that's science, you need to have the science?
"[McLemores' counsel:] Object to the form.
"A. That's correct.
"[Mazda's counsel:] What's the objection?
"[McLemores' counsel:] To use the word science without defining it. There's a specific definition for science-
"[Mazda's counsel:] How would you-
"[McLemores' counsel:] -as it applies in this State. So I am not conceding what he's doing is science within that definition."
Likewise, at no time in their submissions to the trial court or in their arguments to the jury did the plaintiffs' counsel contend that Wallingford's testimony was scientific in nature.
More importantly, Wallingford never claimed in his testimony that he was a scientist or that his conclusions were based upon a particular scientific theory or principle. The word "scientific" was used in Wallingford's testimony a total of 4 times throughout what comprises over 230 pages of record testimony.[13] In three of those instances, Wallingford referred to having used the "scientific method" in the course of describing his use of failure analysis to determine the cause of the fire.[14] But the context of those statements shows that Wallingford was merely using a shorthand for describing failure analysis itself. As he explained, failure analysis involves "try[ing] to establish the probabilities of *183 the types of failure. And then after going through a hypothesis that we test, we establish what most probably occurred during the event." In other words, the process involves listing the possible failures that caused an event and determining which possible failure has the highest probability of occurring under the circumstances. Wallingford's testimony makes it clear that the determination of probabilities was based on his specialized knowledge of automotive technology and his experience with automotive-fuel fires, not on a scientific formula or theory.
In fact, it is apparent from a fair reading of Wallingford's testimony as a whole that all of his conclusions were based upon his own specialized knowledge and experience in and with automotive technology and the automotive industry and not "on a scientific theory, principle, methodology, or procedure." Rule 702(b), Ala. R. Evid. Wallingford stated that he used the same methodology he has used for decades in evaluating the alleged design defect and the cause of the fire in this case. He twice inspected and photographed the subject Mazda3. He reviewed accident-scene photographs taken by the police, and he factored in witness and expert deposition testimony. He used measuring equipment to map the crush of the subject Mazda3, and he compared it to an exemplar Mazda3 so that he could measure how far various component parts were displaced from their original locations during the accident. He relied upon his specialized knowledge of failure analysis as well as his experience with fuel tanks in studying automotive fuel-fed fires. Accordingly, Wallingford's testimony represented the application of his knowledge and experience to the testimony from other witnesses and to comparisons of the subject Mazda3 and other vehicles.
The United States Supreme Court in Daubert drew a distinction between "scientific" evidence and "technical[ ] or other specialized knowledge." See Daubert, 509 U.S. at 590 n.8. The Benfield court itself noted the same distinction. See Benfield, 140 F.3d at 920 n.15 (stating that "if an expert's testimony is based on his experience, and not on science, then such non-scientific expert testimony is not to be held to the Daubert standard"). Before the amendment to Rule 702, Ala. R. Evid., our courts drew the same distinction when addressing whether a specific type of evidence was considered "scientific" for purposes of the standard set out in Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923).[15] See, e.g., Barber v. State, 952 So.2d 393, 417 (Ala. Crim. App. 2005) (determining that "because print identification involves subjective observations and comparisons based on the expert's training, skill, or experience, ... it does not constitute scientific evidence and ..., therefore, Frye does not apply"); Minor v. State, 914 So.2d 372, 400 (Ala. Crim. App. 2004) (holding expert's testimony not subject to Frye because it "was not a scientific theory, but was merely [the expert's] opinion based on his experience and training as a pediatric trauma surgeon"); and ArvinMeritor, Inc. v. Johnson, 1 So.3d 77, 92 (Ala. Civ. App. 2008) (noting a "physician's opinion as to causation is as much an 'art' as a science, based on factors not readily quantifiable and derived, instead, from the witness's overall experience, skill, and training as a physician").
*184 See also Robert J. Goodwin, An Overview of Alabama's New Daubert -Based Admissibility Standard, 73 Ala. Law. 196, 199 (May 2012) (noting that, "[a]s a general proposition, the determination of what is scientific in other Daubert states (and in pre- Kumho Tire [Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999),] federal court decisions) is guided by precedent and principles developed under the Frye standard, and distinguish between specialized and technical knowledge, which is not considered scientific and subject to the Daubert test, and scientific evidence, which, of course, is subject to Daubert," and citing multiple cases).
The trial court understood this distinction when it analyzed the nature of Wallingford's testimony.[16] Based on its understanding *185 of this distinction, the trial court concluded that Wallingford's testimony that the subject Mazda3 contained a design defect that caused the post-collision fire was based upon his technical knowledge and long experience in the automotive industry, not upon a scientific theory or principle.
" ' "[W]hether a particular witness will be allowed to testify as an expert is left to the sound discretion of the trial court, whose decision will not be disturbed on appeal except for abuse of that discretion." ' " Bagley v. Mazda Motor Corp., 864 So.2d 301, 304 (Ala. 2003) (quoting Ammons v. Massey-Ferguson, Inc., 663 So.2d 961, 962 (Ala. 1995) (Houston, J., concurring specially), quoting in turn Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala. 1994) ). Mazda essentially asks us to ignore the trial court's discretion in this instance and to substitute for it a blanket rule that an expert's use of the word "science" in his or her testimony-even if sparse and insignificant in comparison to the expert's overall testimony-demands that the testimony be categorized as "scientific evidence" under Rule 702(b). We decline to adopt such a rigid rule in this context. Instead, we agree with the trial court's assessment of the nature of Wallingford's testimony. Therefore, we conclude that the trial court did not err in declining to exclude Wallingford's testimony on the basis of Rule 702(b).
B. Jury Instructions on Contributory Negligence Regarding Sydney's AEMLD Claim
Mazda contends that the trial court erred in refusing to instruct the jury on contributory negligence regarding Sydney's AEMLD claim. Mazda argues that contributory negligence is a defense to Sydney's claim and that it presented evidence indicating that Sydney was contributorily negligent.
"A trial court has broad discretion when formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Clayton v. LLB Timber Co., 70 So.3d 283 (Ala. 2011) ; Arthur v. Bolen, 41 So.3d 745 (Ala. 2010). Therefore, the standard of review for jury instructions generally is whether the trial court exceeded its discretion in giving or refusing to give an instruction. Id."
Lee v. Houser, 148 So.3d 406, 417 (Ala. 2013).
The plaintiffs' theory on their AEMLD claims was that a defect in the design of the subject Mazda3's fuel system caused Natalie and Sydney to suffer fire-related injuries that they would not otherwise have suffered in the accident that occurred.
"[A] cause of action ... exist[s] against an automobile manufacturer where it is alleged that an automobile manufactured by it was defective, and was involved in an accident, and that the defect, although not causing the accident to occur, contributed to the injuries sustained therein. This Court also holds that such an action may be brought under the A.E.M.L.D."
General Motors Corp. v. Edwards, 482 So.2d 1176, 1191 (Ala. 1985).
In defense of the trial court's instructions in this case, Sydney cites Williams v. Delta International Machinery Corp., 619 So.2d 1330 (Ala. 1993), a case in which the Court sought to clarify the holding in an *186 earlier case, Dennis v. American Honda Motor Co., 585 So.2d 1336 (Ala. 1991) :
"[W]e direct the attention of the bench and bar to the specific holding in Dennis, which involved an AEMLD claim against American Honda Motor Company ('Honda') with respect to an allegedly defective motorcycle helmet. The plaintiff was injured when the motorcycle he was driving collided with a log truck. Honda contended that the accident was caused by contributory negligence on the part of the plaintiff-speeding and in running into the back of the log truck. The trial court instructed the jury, in essence, that if it found that the plaintiff had negligently operated the motorcycle and that his negligence had contributed to cause the accident, then it should return a verdict in Honda's favor.
"On the appeal in Dennis, the majority of this Court stated the issue as follows: '[W]hether the trial court erred in charging the jury on contributory negligence as it related to the cause of the accident.' If the contributory negligence instruction had been limited to the plaintiff's failure to exercise reasonable care in his wearing of the helmet (i.e., if it had related to an alleged product misuse), then such an instruction would have been proper under this Court's previous interpretations of the AEMLD. See Harley-Davidson, Inc. v. Toomey, 521 So.2d 971 (Ala. 1988). Justice Kennedy, for a majority of this Court, wrote in Dennis: 'It would be wholly inconsistent to allow the manufacturer of a safety device such as a motorcycle helmet to design a defective product and then allow that manufacturer to escape liability when the product is used for an intended use, i.e., the very purpose of the helmet.' 585 So.2d at 1340. The trial error in Dennis was in not limiting the contributory negligence charge to the plaintiff's use of the helmet as opposed to the plaintiff's allegedly negligent operation of his motorcycle."
619 So.2d at 1332.
Sydney argues that Dennis and Williams foreclose the idea that, when a plaintiff's negligence contributes to the causation of a vehicular accident, such negligence is, for that reason alone, available as a defense in an action to recover for injuries resulting from a lack of crashworthiness of the vehicle in that accident. Mazda counters that in General Motors Corp. v. Saint, 646 So.2d 564 (Ala. 1994), the Court further clarified its holding in Dennis and, in so doing, explained that Dennis did not eliminate the possibility of contributory negligence as a defense to claims such as those presented here.
The Court in Saint stated:
"In Dennis, Honda alleged that Dennis had been contributorily negligent in causing the accident, not that he had been negligent in wearing the helmet he claimed was defective. The trial judge charged the jury on contributory negligence with regard to accident causation. This Court reversed the judgment based on the verdict in favor of Honda and held that a plaintiff's negligence in causing an accident is not a bar to an AEMLD action. 585 So.2d at 1342. This Court did not hold that a plaintiff's contributory negligence relating to the defective product is no longer a defense in product liability cases."
646 So.2d at 565-66 (some emphasis added).
In Saint, the plaintiff alleged that a defective seat belt caused her injuries. This Court further observed in Saint:
"The situation here is just the reverse of that in Dennis. GM maintains that Ms. Saint was not wearing her seat belt or, in the alternative, that she put the slack in her seat belt. Whether Ms. *187 Saint was, in fact, wearing her seat belt was hotly contested at trial, with testimony from each side supporting its position."
646 So.2d at 566.
The Saint Court explained that a contributory-negligence charge was appropriate in that case because the charge addressed the manner in which the plaintiff used the specific component or safety device that she claimed to have malfunctioned:
"There was evidence from Ms. Saint's own expert that she allowed slack to remain in her seat belt. GM clearly foresaw the danger that would result from someone's doing so and warned against it in its owner's manual. From that evidence, a jury could find that, although Ms. Saint did not use her seat belt in an unintended or unforeseen manner, she nonetheless was negligent-that is, that she failed to use reasonable care-in wearing it."
646 So.2d at 568 (emphasis added).
Nonetheless, Mazda contends that contributory negligence is a defense in this case, arguing that "Sydney's conduct caused the post-collision fire and the resulting enhanced injuries that underlie her crashworthiness claim." Mazda cites testimony from its design expert Tom Patterson as evidence indicating that Sydney's negligence contributed to her injuries. In particular, it notes that Patterson testified that the accident "involve[d] forces" that were "beyond those which can be engineered from the standpoint of guaranteeing structural or occupant safety." He also stated that "[t]he overall design [of an automobile] could not withstand those types of forces" in a way that could "guarantee" prevention of a fuel-fed fire. More specifically, Patterson testified that if the subject Mazda3 had hit the pole head-on from the front it probably would have withstood the force and avoided a fire, but because the pole impact was a side collision, occupant safety could not be guaranteed.[17]
The problem with Patterson's testimony, and in turn with Mazda's argument based on that testimony, is that it does not adequately address the distinction between negligence that might have contributed to causing the accident and negligence that might have contributed to causing the actionable AEMLD injuries in this case. Neither Patterson's testimony nor Mazda's argument articulates a difference, or indicates how to distinguish, between vehicular speeds that might have merely caused the accident and some greater vehicular speed sufficient to cause the failure of an otherwise crashworthy fuel-system design. Instead, the focus of Patterson's testimony is the design and movement dynamics of the vehicle's components, its muffler and fuel tank, in relation to one another, not the speed of the vehicle itself or the specific relationship between that speed and the movement of these components. Patterson's testimony goes more to the question whether Mazda's design was deficient at all. When asked about the feasibility of designing an automotive vehicle that would perform more safely in a 30-35 m.p.h. side-pole collision, Patterson responded that "had the pole impact occurred in the front of the vehicle where there's more material to absorb the energy, the results would have been tremendously different" and that no design could "guarantee" a safe outcome in such a collision. He does not, for example, testify that Sydney's speed was so extreme that it caused this particular muffler to penetrate the fuel tank in a way that it otherwise would not have.
*188 In Dennis, Williams, and Saint, the Court was concerned with whether the plaintiff's alleged negligence was directed specifically to the instrument or component-the defect that provided the basis for recovery under the AEMLD. The issue in those cases was whether there was negligence specific to the instrument or component that failed. If there was (as with regard to the seat belt in Saint ), then contributory negligence was available as a defense to the defendant; if there was not (as in Dennis because the alleged negligence involved handling of the motorcycle, not the helmet), then contributory negligence was not available.
As this Court has explained regarding so-called "crashworthiness" claims, such claims do not turn on the issue of accident causation but, instead, "focus on the alleged defect as being the proximate cause of the injury or damage." Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378, 385 (Ala. 1993). "[C]ollisions 'are a statistically foreseeable and inevitable risk within the intended use of an automobile' and ... 'while the user must accept the normal risk of driving, he should not be subjected to an unreasonable risk of injury due to a defective design.' " Dennis, 585 So.2d at 1340 (quoting General Motors Corp. v. Edwards, 482 So.2d 1176, 1181 (Ala. 1985), citing Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968) ).
In this case, Mazda claims that the same negligence that caused the accident also caused the fuel system to fail. But there was not substantial evidence upon which a jury could distinguish between a rate of speed by Sydney that would have helped cause an accident and a rate of speed that would have helped cause this particular fuel system to fail when it would not have otherwise done so. That is, there is not sufficient evidence that Sydney's alleged negligence proximately caused her injuries. Accordingly, we conclude that the trial court did not err in declining to instruct the jury on contributory negligence in this case.
C. Wantonness
1. Sydney's Wantonness Claim
In its motions for a judgment as a matter of law at the close of the plaintiffs' case-in-chief and at the close of all the evidence, Mazda argued that the McLemores had failed to present substantial evidence of their wantonness claim. The trial court denied those motions and submitted the wantonness claim to the jury. Mazda contends that the trial court erred in doing so.
"This Court applies the same standard of review to a ruling on a motion for a [judgment as a matter of law] as the trial court used in initially deciding the motion. This standard is 'materially indistinguishable from the standard by which we review a summary judgment.' Hathcock v. Wood, 815 So.2d 502, 506 (Ala. 2001). We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to [the plaintiff], would warrant a jury verdict in his favor. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala. 2002). 'Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Furthermore, 'we review the record as of the time the motion for a JML was renewed at the close of all the evidence.' Alabama Power Co. v. Aldridge, 854 So.2d 554, 561 (Ala. 2002)."
*189 Webb Wheel Prods., Inc. v. Hanvey, 922 So.2d 865, 870 (Ala. 2005).
Mazda's argument centers on the fact that wantonness requires evidence of conscious knowledge that an injury probably will result from doing the act in question.
" ' "Wantonness" has been defined by this Court as the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.... The knowledge of the defendant is the sine qua non of wantonness.' "
McMahon v. Yamaha Motor Corp., U.S.A., 95 So.3d 769, 773 (Ala. 2012) (quoting Ex parte Essary, 992 So.2d 5, 9 (Ala. 2007) ). "Willfulness or wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act ...." Ex parte Dixon Mills Volunteer Fire Dep't, Inc., 181 So.3d 325, 333 (Ala. 2015) (internal quotation marks omitted).
"On her wantonness claim, Mrs. Thompson[, who was struck by falling merchandise,] had to present evidence indicating that Wal-Mart knew that a practice it was engaging in would likely or probably result in the injury allegedly suffered by Mrs. Thompson. 'Wantonness' is statutorily defined as 'conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' Ala. Code 1975, § 6-11-20(b)(3). ... Accordingly, to prove 'wantonness,' one need not prove intentional conduct; however, proof of wantonness still requires evidence of a reckless or conscious disregard of the rights and safety of others."
Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 654 (Ala. 1998) (first emphasis added).
Mazda argues that Sydney failed to demonstrate that Mazda had conscious knowledge that its design of the fuel system on the subject Mazda3 would result in the kind of injuries sustained by Sydney. Its argument rests primarily on a series of safety tests it introduced at trial that it says demonstrate that Mazda did not have the requisite knowledge that an injury would probably occur because of its design of the fuel system.
Mazda introduced evidence indicating that it performed tests on the Mazda3 for compliance with the Federal Motor Vehicle Safety Standards ("FMVSS") of the National Highway Traffic and Safety Administration ("the NHTSA"). Mazda showed that the Mazda3 exceeded the standards for FMVSS 201 (pole side-impact test), FMVSS 214 (side-collision test), and FMVSS 301 (rear-end offset-collision test). Although the NHTSA's standards permit a small amount of fuel spillage from fuel tanks and fuel lines, Mazda's own target standard was to achieve zero fuel spillage, and the Mazda3 met that goal in each of those tests.
Mazda also introduced evidence indicating that the NHTSA had a third-party independent contractor perform tests on the Mazda3. The independent contractor performed an FMVSS 201 pole side-impact test and an FMVSS 214 side-collision test. The Mazda3 passed these tests as well, and the results indicated that the Mazda3 leaked no fuel in the tests. (For reasons that were not explained, however, the independent contractor removed the muffler before performing the FMVSS 201 test.)
Mazda introduced-through its corporate representative, Hiromu Shibasaki-evidence of other tests it had performed to ensure compliance with the requirements prescribed by European and Japanese safety regulations. The first was an "impact *190 test" meant to measure the resistence of the HDPE fuel tank to puncture, in which the tank was struck in four different locations with what Shibasaki described as a sharp-tipped pendulum.[18] None of the four impacts contacted the side of the fuel tank on which the muffler was located, but the fuel tank withstood all the strikes without puncturing, and it showed no leakage of fuel.
The fuel tank was also subjected to a "resistence to pressure test," a "resistence to fire test," and a "resistence to high temperature test," all of which the fuel tank of the Mazda3 passed.[19] (The plaintiffs noted in cross-examination that Mazda did not reveal the existence of these tests until trial, despite the fact that the plaintiffs had asked for documentation of all such tests during discovery.)
Mazda further introduced evidence indicating that the NHTSA collects and catalogues consumer complaints about automobiles but that the NHTSA had no records of any consumer complaints about the muffler or fuel tank on the 2008 Mazda3. Mazda also never issued a technical service bulletin[20] to its dealerships concerning the muffler or fuel tank of the Mazda3.
As further evidence of its lack of knowledge, Mazda emphasizes that there have been no other lawsuits challenging the muffler and fuel-tank design of the Mazda3. Shibasaki also testified that he was not aware of any record of another post-collision Mazda3 fuel-fed fire. Indeed, during the parties' argument about whether the McLemores' wantonness claims should be submitted to the jury, the trial court observed that "despite the testimony of the Plaintiffs' experts, this is the only time this has happened."
Sydney attempts to counter Mazda's evidence pertaining to safety-test results on the Mazda3 by emphasizing the fact that, in the tests Mazda performed, it did not take pictures of the underside of the tested model. She thus posits that it is possible that Mazda actually tested the California version of the Mazda3 or the version pictured in the Mazda3 service manual, in which the muffler was located behind the rear axle rather than adjacent to the fuel tank. As a result, Sydney argues, the jury was free to discount Mazda's claims that *191 an exemplar of the subject Mazda3 passed all FMVSS tests.
As Mazda notes, however, Sydney's supposition assumes that Mazda committed a fraud upon the federal government by claiming that it tested one version of the Mazda3 even though it actually tested another one and that it did so because it knew that the most prevalent version of the Mazda3 was prone to fuel-fed fires. The McLemores produced no evidence of such fraud. In addition, before trial the plaintiffs moved to exclude all FMVSS test results for the Mazda3 that were not directly relevant to the fuel system. The trial court granted the plaintiffs' motion to exclude. Mazda argues that, if the plaintiffs really believed (and had any evidence indicating) that Mazda did not perform the "relevant" FMVSS tests on the subject Mazda model, then the plaintiffs would have moved to exclude all FMVSS test results on the Mazda3 as irrelevant, but the plaintiffs did not so move. Furthermore, there is no basis on which to conclude that for national-testing purposes Mazda would have tested a version of the Mazda3 produced for only one state or a version the existence of which no one (including the plaintiffs) could produce physical evidence of.
As to the dearth of any record of fuel-fed fires for the relevant-period Mazda3, Sydney claims that the plaintiffs presented evidence of nine other cases of one or more multiple deaths in post-collision fuel-fed fires involving Mazda3s. The problem with this claim is that, although the McLemores' counsel actually mentioned this statistic in closing arguments, Mazda's counsel objected to the injection of the statistic on the ground that "[t]here's no evidence to that." The trial court ruled that it was "going to sustain the objection and ask the jury to disregard that last comment" and that it was "going to grant that request too in terms of there being evidence that was produced in this court about those nine other incidents." In other words, the plaintiffs did not actually introduce any evidence to counter Shibasaki's testimony that he was not aware of any other post-crash fuel-fed fires involving 2008 model Mazda3s.
The Court has repeatedly found that a defendant's lack of knowledge of any other occurrences of similar accidents weighs against a claim of wantonness. For example, in George v. Alabama Power Co., 13 So.3d 360 (Ala. 2008), a city worker who was electrically shocked and seriously injured while installing a new traffic signal sued Alabama Power Company alleging that it had negligently and/or wantonly constructed, operated, or maintained its power lines. In rejecting the plaintiff's wantonness claim, this Court noted that "[n]o evidence was adduced of injuries from such a placement scheme on any electrical-distribution system." 13 So.3d at 368.
In Wal-Mart Stores, Inc. v. Thompson, supra, Elizabeth Thompson sued Wal-Mart, alleging negligence and wantonness in connection with personal injuries she sustained when a small cubical footlocker fell from a shelf and struck her. In agreeing with Wal-Mart that Thompson had failed to produce any evidence of wantonness, this Court noted that, "[a]lthough Wal-Mart's Thomasville store had received two or three reports of falling merchandise before this accident, the management of that store had no information from which they could have known that an accident of the kind which occurred in this case was likely to happen." 726 So.2d at 654.
In Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17 (Ala. 1996), Robert Trzcinski, a pilot, sued Cessna Aircraft Company under the AEMLD seeking damages for personal *192 injuries resulting from an airplane crash, alleging that the shoulder harness in the plane he was flying was defective. This Court concluded that Trzcinski failed to produce clear and convincing evidence of wanton conduct by Cessna justifying punitive damages because he failed to demonstrate that Cessna knew that its method of manufacturing harnesses would probably result in injury to a user of the harnesses. The Court noted that part of the weakness in Trzcinski's case was the lack of "any evidence that the upholstery department had produced any other defective harnesses." 682 So.2d at 21. More specifically, the Court concluded that "there was no evidence that the harnesses were prone to the kind of failure experienced by Trzcinski, or that there had been any reports of similar incidents in the past." 682 So.2d at 22.[21]
Sydney's wantonness claim ultimately rests largely upon the Ford documents relied upon by Wallingford in his testimony about fuel-system design and crashworthiness and evidence indicating that other 2008 Mazda3s were designed differently. With regard to the Ford documents, Sydney argues that the plaintiffs demonstrated that Mazda violated decades-old "industry standards" for fuel-system design because the design of the subject Mazda3 placed a sharp edge immediately adjacent to the fuel tank and Mazda failed to put an adequate guard between the sharp edge and the fuel tank to prevent the possibility of a puncture of the fuel tank during a crash. Because Wallingford testified that it is "recognized in the [automotive] industry that fuel systems represent a fire hazard to people in cars," Sydney argues that Mazda's violation of the industry standards described in the Ford documents constitutes evidence that Mazda "knew that the design of its fuel system" could cause a post-collision fuel-fed fire leading to injuries.
Even construing the facts in the light most favorable to the plaintiffs, however, and therefore accepting that the Ford documents reflected an industry standard for fuel-system design, Mazda's apparent violations of those standards simply establish the core of the plaintiffs' AEMLD claims. The documents do not constitute evidence that Mazda had conscious knowledge that injury would "likely or probably result" from its fuel- and emissions-systems design for the subject model Mazda3. Wallingford testified that automotive manufacturers are aware that fuel systems are a potential source of fires. He also testified that in his opinion Mazda violated fuel-system-design standards known throughout the automotive industry. That-in combination with Wallingford's testimony about feasible alternative designs-certainly constitutes substantial evidence of a design defect under the AEMLD. But it does not establish that Mazda had knowledge that its design would likely result in the kind of fire that occurred in this case.
The evidence presented in fact indicates the opposite: Mazda and an independent third party tested the Mazda3, and the tests showed no instances of fuel spillage from the Mazda3. Moreover, the facts in the record contain no history of complaints about this potential problem or a history of such fires occurring in the Mazda3.
*193 Sydney contends that "Mazda made a conscious decision to manufacture a Mazda3 with a safer practical alternative design but only made the safer design available to California residents." But both Wallingford and Patterson testified that the exhaust system of the California version of the Mazda3 was designed differently because of that state's more stringent emissions regulations. There is no evidence indicating that Mazda used a smooth, rounded muffler in the California version of the 2008 Mazda3 because such a design conformed to industry standards for fuel-system design or that it knew that the California design reduced the risk of post-collision fuel-fed fires.
Sydney also notes that the Mazda3 design depicted in the service manual as well as most makes and models of similarly styled automobiles produced at the time of the subject model Mazda3 placed the fuel tank in front of the rear axle and the muffler behind the rear axle. She contends that this also constitutes evidence of a conscious knowledge on Mazda's part that its design of the subject Mazda3 model probably would result in injuries.
Mazda showed, however, that some automobiles from other manufacturers had a fuel- and exhaust-system design similar to the subject Mazda3 in the placement of the muffler and the fuel tank. More importantly, Patterson's unrefuted testimony was that the reason placement of the muffler behind the rear axle was a standard practice in the automobile industry was to reduce noise in the cabin for the driver and front-seat passenger, not to reduce the likelihood of post-crash fuel-fed fires.
In short, because of the dearth of evidence indicating that Mazda had knowledge that its fuel-system design in the subject Mazda3 probably would result in the kind of fire that occurred in this case, Sydney failed to produce substantial evidence in support of her wantonness claim. Therefore, the trial court erred in refusing to enter a judgment as a matter of law in Mazda's favor on that claim.
2. The Good-Count/Bad-Count Issue
Mazda contends that "the failure of [Sydney's] wantonness claim also requires a new trial on [her] separate AEMLD/design-defect claim (assuming it is not barred on other grounds)." This is so, Mazda says, because the jury returned a general verdict for Sydney that did not differentiate-for either the compensatory- or the punitive-damages award-between the damages attributable to the AEMLD claim and those attributable to the wantonness claim.
"Under the Aspinwall [v. Gowens, 405 So.2d 134 (Ala. 1981),] rule,
" 'when the trial court submits to the jury a good "count"-one that is supported by the evidence-and a "bad count"-one that is not supported by the evidence-and the jury returns a general verdict, this Court cannot presume that the verdict was returned on the good count. In such a case, a judgment entered upon the verdict must be reversed.' "
Long v. Wade, 980 So.2d 378, 385 (Ala. 2007) (quoting Larrimore v. Dubose, 827 So.2d 60, 63 (Ala. 2001), quoting in turn Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1257 (Ala. 1998) (emphasis added in Long )).
Mazda labels this "a textbook 'good count-bad count' case" and argues that "the entire verdict must be vacated, and the AEMLD claim remanded for a new trial." In fact, however, this is not a typical "good-count/bad-count" case. In this case, there was another set of plaintiffs-the Hursts-who brought only an AEMLD claim. The jury found in favor of the Hursts on their AEMLD claim, a claim *194 that stemmed from the same incident and was based on the exact same evidence of product misdesign and failure as was Sydney's AEMLD claim. And the jury awarded the Hursts a substantial damages award. In such a circumstance, it is not plausible that the jury found Mazda liable under the AEMLD for purposes of the Hursts' claims, but not as to Sydney's claims.
The good-count/bad-count rule recognizes that, in the normal case, the Court logically would have to "assume" or "presume" that the jury found in the plaintiff's favor on a "good count" when it returns a general verdict for the plaintiff after having had submitted to it both a "good" count and a "bad" count. See, e.g., Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co., 875 So.2d 1143, 1165-66 (Ala. 2003) ("We cannot assume that the verdict was based only on those ... claims that were properly submitted to the jury."). This is so because, in the normal case, it is not possible to determine how the jury decided the "good count":
"When a jury returns a general verdict upon two or more claims, as it did here, it is not possible for this Court to determine which of the claims the jury found to be meritorious. Therefore, when the trial court submits to the jury a 'good count'-one that is supported by the evidence-and a 'bad count'-one that is not supported by the evidence-and the jury returns a general verdict, this Court cannot presume that the verdict was returned on the good count."
Alfa Mut. Ins. Co., 723 So.2d at 1257 (emphasis added).
But this is the rare case in which we need not "assume" or "presume" anything. In a case like this, where "it is... possible for this Court to determine" how the jury decided the "good count," there is no basis in logic or in the law to ignore this fact or to discard the jury's verdict. Instead, we can and should base our holding on what we can know the jury has already decided. Not only is it logical to do so, doing so in this particular case is consistent with the need for finality and avoids the possibility of inconsistent verdicts as between Sydney's AEMLD claim and the Hursts' AEMLD claim. Further, it avoids the unnecessary expenditure of additional legal expenses and judicial resources to adjudicate a claim that has already been adjudicated.[22]
After first urging this Court to reverse in its entirety the judgment against it on Sydney's AEMLD claim based on its good-count/bad-count argument, Mazda then argues that, "[a]t a minimum, th[is] Court should vacate [Sydney's] $3 million punitive-damages award," which would leave standing the compensatory-damages award made by the jury under the "good" AEMLD count. We believe this latter position is in fact the proper course in this unique case in which the alignment of parties and claims, and the jury's verdict, yields the unavoidable conclusion that the jury found that Mazda misdesigned the car and therefore was in violation of the AEMLD. The elements necessary for recovery under the AEMLD could not be *195 true as to one plaintiff and not as to the other. Mazda either sold a defectively designed car or it did not. The jury found that it did.
The jury also determined the amount of compensatory damages necessary to make Sydney whole. Under applicable principles of appellate review, absent a showing otherwise, we presume the jury followed the trial court's instructions in reaching this verdict. In this case, there is no such showing. Thus, for example, there is no suggestion in this case that instructions as to wantonness somehow improperly affected the jury's compliance with the trial court's instructions concerning compensatory damages, and we see no other reason to question whether the jury followed the trial court's instructions as to how to measure those damages. Apart from its general good-count/bad-count argument, Mazda does not argue that that particular award was defective, nor does it give us any other reason to upset that particular award. Cf. Hobart Corp. v. Scoggins, 776 So.2d 56 (Ala. 2000) (leaving in place those portions of the trial court's judgment adjudicating AEMLD liability and awarding compensatory damages under a preponderance-of-the-evidence standard, even while concluding that the record did not support a finding of clear and convincing evidence of wantonness, thus necessitating reversal of the punitive-damages award under the same count).
3. Sydney's Punitive-Damages Award Based on Wantonness
Although we uphold the award of compensatory damages to Sydney under the AEMLD claim, we cannot uphold the award of punitive damages based on that claim. Because there was not "substantial evidence" of wantonness so as to support the jury's verdict of liability under the applicable "preponderance of the evidence" standard on Sydney's separate wantonness claim, a fortiori, we must recognize that there was not sufficient evidence to support a finding of wantonness under the "clear and convincing evidence" standard required for an award of punitive damages to Sydney under her AEMLD claim. "[T]o justify an award of punitive damages, [wanton conduct] must be proven by 'clear and convincing evidence,' § 6-11-20(a), Ala. Code 1975." Miller v. Bailey, 60 So.3d 857, 867 (Ala. 2010). "Clear and convincing evidence" is a significantly higher standard than a mere preponderance of the evidence and requires "a level of proof" that "will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." § 6-11-20(b)(4), Ala. Code 1975. Sydney sought punitive damages under her AEMLD claim based only on the ground of wantonness (there being no assertion of any of the other three grounds for punitive damages (fraud, oppression, and bad faith) prescribed by Ala. Code 1975, § 6-11-20(a) ).
D. Remittitur of the Hursts' Damages Award
On appeal, Mazda aggregates the Hursts' wrongful-death damages award and Sydney's punitive-damages award and argues that "[t]he $6.9 million punitive-damages award is unconstitutionally excessive." Thus, Mazda does not separately argue that the $3.9 million award of wrongful-death damages for the Hursts is excessive. Nonetheless, given our reversal of the punitive-damages award in favor of Sydney, we will address Mazda's request for a remittitur only insofar as it relates to the Hursts' damages award.
"This Court 'review[s] the trial court's award of punitive damages de novo, with no presumption of correctness.' "
*196 Schaeffer v. Poellnitz, 154 So.3d 979, 986 (Ala. 2014) (quoting Mack Trucks, Inc. v. Witherspoon, 867 So.2d 307, 309 (Ala. 2003) ).
Mazda makes three very brief arguments as to why the award should be reduced based on the "guideposts" discussed in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Those guideposts are: "(1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of the compensatory damages award to the punitive damages award; and (3) the difference between the punitive damages award and comparable awards in similar cases. 517 U.S. at 575-584, 116 S.Ct. at 1598-1603." Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1194 (Ala. 1997).
Mazda contends that "the punitive-to-compensatory 'ratio' counsels remittitur." In Cherokee Electric Cooperative, this Court observed, however, that "Alabama law allows no compensatory damages in a wrongful death case. [The ratio] factor, therefore, does not apply here." 706 So.2d at 1194.
Mazda argues that because there is insufficient evidence of wanton misconduct in this case, there likewise is insufficient evidence of "reprehensibility," which the United States Supreme Court has called "[t]he most important indicium of reasonableness of a punitive damages award." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). This guidepost is also treated differently in the wrongful-death context because of the unique circumstance that, in such a case, the jury is authorized to award punitive damages on a negligence claim. Consequently, this Court has listed certain factors that may be considered in evaluating "reprehensibility" even though no wantonness is present.
"The legislature has authorized the jury to ascertain an amount of damages appropriate to the goal sought to be achieved-preservation of life because of the enormity of the wrong.... The jury's consideration of the 'enormity of the wrong' includes assessing the finality of death, the propriety of punishing the wrongdoer or wrongdoers, whether the death could have been prevented, and, if so, the lack of difficulty that would have been involved in preventing the death, as well as the public's interest in deterring others from committing the same or similar wrongful conduct."
Campbell v. Williams, 638 So.2d 804, 811 (Ala. 1994).
In this case, this plaintiffs demonstrated that it would not have been difficult to avoid the defect found by the jury to have caused the fire in question. Indeed, multiple models of automobiles-including other versions of the Mazda3-would not have presented the same fire risk as was present in the subject Mazda3 because those models either had smooth rounded mufflers next to the fuel tank or the muffler was positioned away from the fuel tank. The plaintiffs also raised questions about whether Mazda could have performed more testing in line with failure analysis to detect this particular defect before the subject Mazda3 was sold to the public.[23]
*197 Moreover, the United States Supreme Court has stated that Alabama's statutory scheme of awarding punitive damages for negligent conduct is permissible because "[w]e cannot say that it is beyond the power of a Legislature ... to attempt to preserve human life by making homicide expensive." Louis Pizitz Dry Goods Co. v. Yeldell, 274 U.S. 112, 116, 47 S.Ct. 509, 71 L.Ed. 952 (1927). All of these facts counsel against a remittitur of the Hursts' damages award.
Finally, Mazda contends that "the jury's punitive-damages award bears no relation to any civil penalty, sanction, or jury verdict in a comparable case because ... there haven't been any." The Hursts concede that Mazda "has not been the subject of any other punitive damage[s] awards relative to the design of this vehicle's fuel and exhaust systems." They correctly note, however, that this Court has upheld awards of similar size in other wrongful-death actions in which there was no history of the defendant's being the subject of other actions. See, e.g., Mack Trucks, Inc. v. Witherspoon, 867 So.2d 307, 309 (Ala. 2003) (ordering remittitur of a $25 million award to $6 million in an AEMLD case involving a tractor that rolled over and caught fire with a person inside the cab); Cherokee Elec. Coop., 706 So.2d at 1194 (upholding a $3.5 million award) ; Campbell, 638 So.2d at 818 (upholding a $4 million award "to punish Dr. Campbell for his action and to deter him and others from committing similar acts in the future"); and General Motors Corp. v. Johnston, 592 So.2d 1054, 1064 (Ala. 1992) (after remittitur, upholding a $7.5 million award in an AEMLD case in which General Motors had defectively designed its 1988 Chevrolet 2500 series pickup truck and had failed to inform its customers about the tendency of the truck to stall). The Hursts' award is not out of line with awards in other wrongful-death cases; therefore, this guidepost also does not counsel a remittitur.
Because none of the factors Mazda raises weighs in favor of a remittitur, we conclude that the trial court did not err in upholding the Hursts' award of $3.9 million for the death of their daughter.
III. Conclusion
The trial court did not err when it declined to subject Wallingford's expert testimony to the requirements of Rule 702(b), Ala. R. Evid.; therefore, Wallingford's testimony was not due to be excluded. Sydney failed to present substantial evidence in support of her wantonness claim. As a result, the wantonness claim should not have been submitted to the jury, and the judgment must be reversed insofar as it includes an award based on that claim. A fortiori, the record does not support an award of punitive damages in connection with Sydney's AEMLD claim against Mazda. We are provided no reason, however, for disturbing the jury's award of compensatory damages based on Sydney's AEMLD claim, and the judgment of the trial court in that regard is due to be affirmed. Finally, Mazda has failed to present any argument that would counsel in favor of a remittitur of the Hursts' damages award on their wrongful-death claim, and, therefore, the jury's $3.9 million award in favor of the Hursts and against Mazda is affirmed. This case is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Stuart, C.J., and Bolin, Wise, and Sellers, JJ., concur.
Parker, Main, and Bryan, JJ., concur in part, concur in the result in part, and dissent in part.
Shaw, J., recuses himself.
MAIN, Justice (concurring in part, concurring in the result in part, and dissenting in part).
*198 I dissent as to Part II.C.1. of the main opinion, and I concur only in the result as to Part II.C.2. Viewing the evidence in the light most favorable to the plaintiffs, I believe that there was substantial evidence of the McLemores' wantonness claim sufficient to submit that issue to the jury. Specifically, the evidence established that the design of the subject 2008 Mazda3, which placed a sharp-edged steel muffler within one-half inch of an unshielded plastic fuel tank, violated both Ford Motor Company design guidelines applicable to the Mazda3 and industry standards for fuel-system design. Indeed, the McLemores' expert testified that this design violated "elementary" design standards and that a reasonable engineer would understand that the sharp steel muffler could penetrate the fuel tank during a collision. The evidence is also clear that Mazda appreciated the hazards to vehicle occupants from crash-related fuel-fed fires. Taken together, I believe that this constituted "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment [could] reasonably infer" that Mazda's conduct was wanton. West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Thus, the trial court did not err in refusing to enter a judgment as a matter of law in Mazda's favor on this claim, and I would affirm the judgment in its entirety.
Parker and Bryan, JJ., concur.

Mazda and various expert witnesses who testified at trial used the term "fuel system," as do we, to refer to what might commonly be thought of as the fuel system in combination with what might commonly be thought of as the exhaust system.

The three automobiles in the survey that placed the muffler next to the fuel tank were the Ford Focus and two configurations of the Mazda3-one produced for California and the subject Mazda3 model.

In the case of the BMW automobiles, the mufflers were placed underneath the fuel tank in the middle of the tank, a design known as a "saddle tank." The testimony concerning the four automobile models did not mention whether the fuel tanks were made of HDPE or steel.

We presume that Schulz intended to refer to "sharp edges" and "flange" of the muffler, rather than the fuel tank.

Wallingford also testified about something called failure-mode-and-effects analysis ("FMEA") that automobile engineers might use to evaluate the effectiveness of the design of a vehicle. Wallingford described it as "a very large, complicated process where I look at many, many different components on a vehicle and I look at how a particular component can fail" and then "identify what is the ... failure. And I rate each consequence typically on a scale of one to ten, and then I identify methods of eliminating the failure itself or handling other events so that the failure does not impact its primary need." Wallingford stated that FMEA is used on fuel systems and its use has been "very commonplace since the early 1960's in the manufacturing world." Wallingford testified that FMEAs are "coupled together" with the hierarchy of design. Wallingford testified that he had not seen any documentation of an FMEA produced by Mazda in this case.

Wallingford testified that Ford had made the documents available in discovery in other lawsuits in which he had been involved.

The jury declined to award Richard McLemore any damages in his individual capacity, and he is not shown as a party on Sydney's appellee's brief.

The Hursts and Sydney attempt to draw a distinction between Wallingford's design-defect opinion and his fire-causation opinion, and they argue that Mazda never challenged Wallingford's design-defect testimony. We question whether such a distinction is viable, given that Wallingford testified that the reason placing a flanged muffler next to the fuel tank is a design defect is because it represents a fuel-fire hazard. In any event, Mazda's motion in limine clearly asked for the exclusion of Wallingford's testimony in its entirety, and the trial court itself acknowledged that Mazda "didn't want [Wallingford] to get up there and testify at all."
The reason for attempting to distinguish between Wallingford's design-defect testimony and his causation testimony is that, the Hursts and Sydney argue, any error in admitting Wallingford's fire-causation testimony "would be harmless because Plaintiffs' source and origin expert, Michael Schulz, testified to the exact same causation opinion before Mr. Wallingford testified." The Hursts and Sydney note, in this regard, that Mazda has not challenged Schulz's testimony in its appeal.
The problem with this argument is that, even if we agreed with the distinction between Wallingford's design-defect and fire-causation testimony, Schulz's causation opinion was not identical to Wallingford's causation opinion. Even to the extent there was any overlap, Wallingford was only one of two witnesses to the opinions given and, accordingly, his testimony would represent a material addition to or corroboration of Schulz's. (As to the former point, for example, Wallingford was the only expert who definitively testified that the flange of the muffler cutting the fuel tank was the cause of the fire. Schulz testified that the cause could have been either the flange of the muffler or the connection where the inlet pipe meets the muffler.) The plaintiffs' AEMLD claims required that they prove that the alleged design defect caused their injuries. If the trial court erred in admitting Wallingford's opinion on causation, the error was not harmless.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The Alabama Legislature in 2011 amended § 12-21-160, Ala. Code 1975, to apply the Daubert"science" standard for expert testimony in certain cases, including "all civil state court actions commenced on or after January 1, 2012." § 12-21-160(d). In November 2012, this Court amended Rule 702 of the Alabama Rules of Evidence in an effort to make Rule 702"consistent" with § 12-21-160. The portion of Rule 702(b) quoted in the text is identical to the language of § 12-21-160(b).

Professors Goodwin and McCarthy are co-authors of the latest edition of McElroy's Alabama Evidence. In the 2013 supplement to that work, they essentially reiterated the above-stated point from Professor Goodwin's article:
"Alabama's version of the Daubert test is not identical to the test used in federal courts and codified in Rule 702. Federal courts apply the Daubert test to all experts-both scientific and nonscientific. By contrast, in Alabama the Daubert admissibility criteria is only applied to scientific experts and evidence. Stated differently, in Alabama it is only the proffer of purportedly scientific evidence that 'triggers' a Daubert inquiry."
Charles Gamble, Robert J. Goodwin & Terrence W. McCarthy, McElroy's Alabama Evidence § 127.02(4)(b) (3)(ii) (6th ed. 2009)(2013 Supplement) (footnote omitted and emphasis added).

In Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court concluded that Daubert's principles should apply to all expert testimony, not just "scientific" testimony. Consequently, in the six-year period between Daubert and Carmichael, many decisions issued by federal courts distinguished between scientific experts and evidence from non-scientific experts for purposes of applying the Daubert test. Benfield was one such decision.

The four instances are as follows:
"[Wallingford:] And failure analysis is looking at various components that most often we think of as breaking or failing and ascertaining through a system of utilizing the scientific method whether that component failed before the event, during the event, or after the event. ..."
R. 1191 (emphasis added).
"Q. ... Tell me what the general purpose was for inspecting the vehicle?
"A. Well, during the scientific method, I have to gather information to attempt to determine what happened, in an attempt to solve the failure analysis."
R. 1284 (emphasis added).
"Q. Now, yesterday Mr. Lee [Mazda's counsel] suggested to Mr. Schulz that during this crash this muffler actually ended up like this, striking the tank with the soft side, with no flanges. And I think he mentioned it in his opening statement.
"Do you have uncontrovertible scientific evidence that it actually ended up like this?
"A. Yes.
"Q. Police photograph?
"A. Yes. Scene photographs taken that night, early in the morning, that shows the post-crash orientation of the tail pipe and the rear hanger bracket."
R. 1301-02 (emphasis added).
"Q. ... But I want to ask you this: In doing the work that you did, did you do any testing on an exemplar fuel tank to see if your theory of what happened in this accident could happen?
"A. No, sir, it wasn't necessary. Utilizing principles, the scientific method and realizing the number of cases I have performed testing in the past, I proved the hypothesis by a deductive process. There's no question when I move a fuel tank-excuse me, when I move a sharp object, in this case the muffler, a foot to a foot and a half into the space of a liquid container that can easily be cut, that there was a failure."
R. 1339-40 (emphasis added).

In the fourth instance, the term "scientific evidence" was used to refer to accident-scene photographs that by themselves plainly do not come within the definition of "scientific evidence."

It has been observed that "during the drafting of the final version [of the bill amending § 12-21-160, Ala. Code 1975 ], consideration was also given to the fact that Alabama had already developed substantial case law defining 'scientific evidence' relative to the Frye standard." The Honorable Ben H. Brooks III and K. Megan Brooks, Alabama's Version of Daubert-A Legislative History, 74 Ala. Law. 44, 46-47 (Jan. 2013).

After the parties presented their arguments concerning Mazda's renewed motion to strike Wallingford's testimony, the trial court reviewed its notes regarding his testimony and observed:
"He testified about who he relied upon. Kirk[,] Schulz, very important. [Wallingford] did his own independent evaluation of how the muffler sliced the fuel tank, the general principles, the one, two, three, four design the problem away, if you can't then guard the problem away, warn the user of the hazard and if you can't do those three things, then you don't release the product.
"Fuel leakage is a potential hazard for the fire. His observations are not scientific in nature. He testified that the muffler does not comply with industry standards and is very sharp. That has got no scientific analysis towards it. It is only a half an inch from the fuel tank so the location of the muffler also is not compliant with industry standards. The California version of the same vehicle is compliant. He has reviewed Mazda's service manual, and there was another version that Mazda was utilizing which had a round tubular-where the exhaust was. He talked about the physical nature of where these components were, the muffler is behind the rear axle.
"Again, none of this is scientific. This complies as it will not hit the fuel tank, it is far away, just by physical observation. He talked about the fact that almost all the manufacturers do crash testing, he said. And that should be done early on. He does not believe that the fuel lines were a factor in the fire in this case because they were further away from where the fire started. Basically that's a summary of his testimony.
"....
"... The gas tank is not-I mean, your arguments go toward the weight of his testimony, not the admissibility of his testimony. I believe that-because he is not testifying about anything scientific. I know you disagree with that, but I'm just going through my notes of what he testified to.
"... He said specifically the muffler just came down and slashed, made a cutting intrusion into the tank. He admitted that at times his testimony has been disregarded by courts because there was no testing, on cross[-examination].
"And here is where he went to file something. The witness did no testing because it was not necessary due to using the scientific methods (inaudible) testified to. There's no question he uses common sense on those types of an argument.
"With regard to the scientific basis that he used, this is what he said-he said he identified what the problem was. The problem was the post-collision loss of fuel and fire. Two, failure analysis, determine why and gather data. Three, analyze the data with regard to deformation to the vehicle, ... the position of the tail pipe and muffler. Scene photos. Orientation, location of the inlet pipe to the muffler-look at the shear surface on the muffler and the exit end of the muffler pipe. Deformation and the two fuel tank straps.
"And he formed-based upon his analysis of those four factors, he formed his hypothesis that the fuel tank was compromised by the muffler.
"Were there any other opportunities of fuel leakage in the crash? No. So the only probability in his mind ... was that the metal muffler came into contact with the plastic fuel tank, sliced it open and allowed the fuel to spill. It's based upon really his physical observation of the components. It would be impossible to test this ....
"But I'm making just a preliminary ruling that he didn't testify to any type of scientific principles. He just made his observations based upon his forty years of experience and his knowledge of the automotive industry and his observations of data that he had been given by others."
(Emphasis added.)

There was testimony that the vehicle hit the pole at "a 33 degree angle."

On cross-examination, the plaintiffs introduced a blown-up picture of the pendulum, which, they argued, indicated that the pendulum did not contain a sharp point.

As noted, Mazda's representative at trial was Hiromu Shibasaki, an automotive engineer who worked in Mazda's "crash safety development department," specifically concerning side- and rear-crash safety. Shibasaki testified that Mazda conducted additional tests, both "static" and "dynamic," in which Mazda used actual fuel-system components to evaluate whether the muffler would penetrate the wall of the fuel tank in the event of a collision. According to Shibasaki, in the dynamic test, the fuel tank was secured and then "hit" with the muffler (with the aluminum shield in place between them) moving at approximately "seven to ten meters per second." Shibasaki stated that the speed at which the muffler impacted the HDPE fuel tank would be achieved by a vehicular collision approximating that required by the FMVSS 214 test, which is 33.5 m.p.h. As for the static test, which involved a slower "push" of the muffler into the aluminum shield and then into the fuel tank, Shibasaki testified that after the muffler contacts the tank "then the shoulder of the muffler will push the tank. If you still keep pushing the tank will be pushed in like this in the shape of the muffler," up to "about four to five inches." Again, in neither test, according to Shibasaki, was there any cutting or penetration of the HDPE wall of the fuel tank.

A technical service bulletin is an instruction sent by a manufacturer to its dealerships about the need to diagnose and repair a problem discovered by the NHTSA or the manufacturer.

See also Pitt v. Century II, Inc., 631 So.2d 235, 240 (Ala. 1993) (affirming a directed verdict for the defendant on a wantonness claim in a case involving a crane malfunction and noting a lack of "evidence to indicate that there had been reports of similar incidents"); Gilbert v. Southern Bell Tel. & Tel. Co., 200 Ala. 3, 4, 75 So. 315, 316 (1917) (rejecting a wantonness claim by a plaintiff who crashed his automobile into a utility pole owned by the defendant and who argued that the defendant was wanton in placing the pole near the road and noting that "[t]here was no evidence that any one else had ever been hurt there").

Cf. Union Mortg. Co. v. Barlow, 595 So.2d 1335, 1344 (Ala. 1992) (recognizing the general rule that judgments on inconsistent verdicts are ordinarily reversed in their entirety without speculation as to which claim the jury intended, but also recognizing the appropriateness of upholding a verdict on one count and striking the verdict on the other count where unique circumstances enable the court to discern the jury's intent); Farmers & Merchants Bank of Centre v. Hancock, 506 So.2d 305 (Ala. 1987) (ordering remittitur and upholding the jury verdict as to one count and reversing as to an inconsistent verdict on another count).

Sydney notes in her brief:
"During the design and development of a vehicle, automakers use an engineering process known as the failure mode and effects analysis (FMEA) to evaluate the effectiveness of its design. FMEAs test the different components on a vehicle in different ways to determine when and how they fail. The process identifies areas of potential failures. The automobile industry uses FMEAs to analyze the safety of fuel systems. The industry has been using this design tool since the early 1960s. The jury heard that Mazda produced no FMEAs on its fuel and exhaust system in this case."
(Record citations omitted.)